(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HALL *v*. FLORIDA

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 12–10882. Argued March 3, 2014—Decided May 27, 2014

After this Court held that the Eighth and Fourteenth Amendments forbid the execution of persons with intellectual disability, see *Atkins* v. *Virginia*, 536 U. S. 304, 321, Hall asked a Florida state court to vacate his sentence, presenting evidence that included an IQ test score of 71. The court denied his motion, determining that a Florida statute mandated that he show an IQ score of 70 or below before being permitted to present any additional intellectual disability evidence. The State Supreme Court rejected Hall's appeal, finding the State's 70-point threshold constitutional.

*Held*: The State's threshold requirement, as interpreted by the Florida Supreme Court, is unconstitutional. Pp. 5–22.

(a) The Eighth Amendment, which "reaffirms the duty of the government to respect the dignity of all persons," *Roper* v. *Simmons*, 543 U. S. 551, 560, prohibits the execution of persons with intellectual disability. No legitimate penological purpose is served by executing the intellectually disabled. *Atkins*, 563 U. S., at 317, 320. Prohibiting such executions also protects the integrity of the trial process for individuals who face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel. *Id.*, at 320–321. In determining whether Florida's intellectual disability definition implements these principles and *Atkins'* holding, it is proper to consider the psychiatric and professional studies that elaborate on the purpose and meaning of IQ scores and how the scores relate to *Atkins*, and to consider how the several States have implemented *Atkins*. Pp. 5–7.

(b) Florida's rule disregards established medical practice. On its face, Florida's statute could be consistent with the views of the medical community discussed in *Atkins* and with the conclusions reached

here. It defines intellectual disability as the existence of concurrent deficits in intellectual and adaptive functioning, long the defining characteristic of intellectual disability. See *Atkins, supra,* at 308. And nothing in the statute precludes Florida from considering an IQ test's standard error of measurement (SEM), a statistical fact reflecting the test's inherent imprecision and acknowledging that an individual score is best understood as a range, *e.g.*, five points on either side of the recorded score. As interpreted by the Florida Supreme Court, however, Florida's rule disregards established medical practice in two interrelated ways: It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts would consider other evidence; and it relies on a purportedly scientific measurement of a defendant's abilities, while refusing to recognize that measurement's inherent imprecision. While professionals have long agreed that IQ test scores should be read as a range, Florida uses the test score as a fixed number, thus barring further consideration of other relevant evidence, *e.g.*, deficits in adaptive functioning, including evidence of past performance, environment, and upbringing. Pp. 7–12.

(c) The rejection of a strict 70-point cutoff in the vast majority of States and a "consistency in the trend," *Roper, supra,* at 567, toward recognizing the SEM provide strong evidence of consensus that society does not regard this strict cutoff as proper or humane. At most, nine States mandate a strict IQ score cutoff at 70. Thus, in 41 States, an individual in Hall's position would not be deemed automatically eligible for the death penalty. The direction of change has been consistent. Since *Atkins*, many States have passed legislation to comply with the constitutional requirement that persons with intellectual disability not be executed. Two of those States appear to set a strict cutoff at 70, but at least 11 others have either abolished the death penalty or passed legislation allowing defendants to present additional intellectual disability evidence when their IQ score is above 70. Every state legislature, save one, to have considered the issue after *Atkins* and whose law has been interpreted by its courts has taken a position contrary to Florida's. Pp. 12–16.

(d) *Atkins* acknowledges the inherent error in IQ testing and provides substantial guidance on the definition of intellectual disability. The States play a critical role in advancing the protections of *Atkins* and providing this Court with an understanding of how intellectual disability should be measured and assessed, but *Atkins* did not give them unfettered discretion to define the full scope of the constitutional protection. Clinical definitions for intellectual disability which, by their express terms, rejected a strict IQ test score cutoff at 70, and which have long included the SEM, were a fundamental premise of

Syllabus

*Atkins.* See 536 U. S., at 309, nn. 3, 5. A fleeting mention of Florida in a citation listing States that had outlawed the execution of the intellectually disabled, *id.*, at 315, did not signal the *Atkins* Court's approval of the State's current understanding of its law, which had not yet been interpreted by the Florida Supreme Court to require a strict 70-point cutoff. Pp. 16–19.

(e) When a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits. This legal determination of intellectual disability is distinct from a medical diagnosis but is informed by the medical community's diagnostic framework, which is of particular help here, where no alternative intellectual disability definition is presented, and where this Court and the States have placed substantial reliance on the medical profession's expertise. Pp. 19–22.

109 So. 3d 704, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–10882

FREDDIE LEE HALL, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[May 27, 2014]

JUSTICE KENNEDY delivered the opinion of the Court.

This Court has held that the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. *Atkins* v. *Virginia*, 536 U. S. 304, 321 (2002). Florida law defines intellectual disability to require an IQ test score of 70 or less. If, from test scores, a prisoner is deemed to have an IQ above 70, all further exploration of intellectual disability is foreclosed. This rigid rule, the Court now holds, creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional.

I

On February 21, 1978, Freddie Lee Hall, petitioner here, and his accomplice, Mark Ruffin, kidnaped, beat, raped, and murdered Karol Hurst, a pregnant, 21-year-old newlywed. Afterward, Hall and Ruffin drove to a convenience store they planned to rob. In the parking lot of the store, they killed Lonnie Coburn, a sheriff's deputy who attempted to apprehend them. Hall received the death penalty for both murders, although his sentence for the Coburn murder was later reduced on account of insufficient evidence of premeditation. *Hall* v. *Florida*, 403

So. 2d 1319, 1321 (Fla. 1981) (*per curiam*).

Hall argues that he cannot be executed because of his intellectual disability. Previous opinions of this Court have employed the term "mental retardation." This opinion uses the term "intellectual disability" to describe the identical phenomenon. See Rosa's Law, 124 Stat. 2643 (changing entries in the U. S. Code from "mental retardation" to "intellectual disability"); Schalock et. al, The Renaming of *Mental Retardation*: Understanding the Change to the Term *Intellectual Disability*, 45 Intellectual & Developmental Disabilities 116 (2007). This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts; the manual is often referred to by its initials "DSM," followed by its edition number, *e.g.,* "DSM–5." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).

When Hall was first sentenced, this Court had not yet ruled that the Eighth Amendment prohibits States from imposing the death penalty on persons with intellectual disability. See *Penry* v. *Lynaugh*, 492 U. S. 302, 340 (1989). And at the time, Florida law did not consider intellectual disability as a statutory mitigating factor.

After this Court held that capital defendants must be permitted to present nonstatutory mitigating evidence in death penalty proceedings, *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987), Hall was resentenced. Hall then presented substantial and unchallenged evidence of intellectual disability. School records indicated that his teachers identified him on numerous occasions as "[m]entally retarded." App. 482–483. Hall had been prosecuted for a different, earlier crime. His lawyer in that matter later testified that the lawyer "[c]ouldn't really understand anything [Hall] said." *Id.*, at 480. And, with respect to the murder trial given him in this case, Hall's counsel recalled

that Hall could not assist in his own defense because he had "'a mental . . . level much lower than his age,'" at best comparable to the lawyer's 4-year-old daughter. Brief for Petitioner 11. A number of medical clinicians testified that, in their professional opinion, Hall was "significantly retarded," App. 507; was "mentally retarded," *id.,* at 517; and had levels of understanding "typically [seen] with toddlers," *id.,* at 523.

As explained below in more detail, an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is central to the framework followed by psychiatrists and other professionals in diagnosing intellectual disability. See DSM–5, at 37. Hall's siblings testified that there was something "very wrong" with him as a child. App. 466. Hall was "slow with speech and . . . slow to learn." *Id.*, at 490. He "walked and talked long after his other brothers and sisters," *id.*, at 461, and had "great difficulty forming his words," *id.*, at 467.

Hall's upbringing appeared to make his deficits in adaptive functioning all the more severe. Hall was raised—in the words of the sentencing judge—"under the most horrible family circumstances imaginable." *Id.*, at 53. Although "[t]eachers and siblings alike immediately recognized [Hall] to be significantly mentally retarded . . . [t]his retardation did not garner any sympathy from his mother, but rather caused much scorn to befall him." *Id.*, at 20. Hall was "[c]onstantly beaten because he was 'slow' or because he made simple mistakes." *Ibid.* His mother "would strap [Hall] to his bed at night, with a rope thrown over a rafter. In the morning, she would awaken Hall by hoisting him up and whipping him with a belt, rope, or cord." *Ibid.* Hall was beaten "ten or fifteen times a week sometimes." *Id.,* at 477. His mother tied him "in a 'croaker' sack, swung it over a fire, and beat him," "buried him in the sand up to his neck to 'strengthen his legs,'" and

"held a gun on Hall . . . while she poked [him] with sticks." *Hall* v. *Florida*, 614 So. 2d 473, 480 (Fla. 1993) (Barkett, C. J., dissenting).

The jury, notwithstanding this testimony, voted to sentence Hall to death, and the sentencing court adopted the jury's recommendation. The court found that there was "substantial evidence in the record" to support the finding that "Freddie Lee Hall has been mentally retarded his entire life." App. 46. Yet the court also "suspect[ed] that the defense experts [were] guilty of some professional overkill," because "[n]othing of which the experts testified could explain how a psychotic, mentally-retarded, brain-damaged, learning-disabled, speech-impaired person could formulate a plan whereby a car was stolen and a convenience store was robbed." *Id.*, at 42. The sentencing court went on to state that, even assuming the expert testimony to be accurate, "the learning disabilities, mental retardation, and other mental difficulties . . . cannot be used to justify, excuse or extenuate the moral culpability of the defendant in this cause." *Id.*, at 56. Hall was again sentenced to death. The Florida Supreme Court affirmed, concluding that "Hall's argument that his mental retardation provided a pretense of moral or legal justification" had "no merit." *Hall*, 614 So. 2d, at 478. Chief Justice Barkett dissented, arguing that executing a person with intellectual disability violated the State Constitution's prohibition on cruel and unusual punishment. *Id.,* at 481–482.

In 2002, this Court ruled that the Eighth Amendment prohibited the execution of persons with intellectual disability. *Atkins* v. *Virginia*, 536 U. S., at 321. On November 30, 2004, Hall filed a motion claiming that he had intellectual disability and could not be executed. More than five years later, Florida held a hearing to consider Hall's motion. Hall again presented evidence of intellectual disability, including an IQ test score of 71. (Hall had received

nine IQ evaluations in 40 years, with scores ranging from 60 to 80, Brief for Respondent 8, but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80. See App. 107; 109 So. 3d 704, 707 (Fla. 2012)). In response, Florida argued that Hall could not be found intellectually disabled because Florida law requires that, as a threshold matter, Hall show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability. App. 278–279 ("[U]nder the law, if an I. Q. is above 70, a person is not mentally retarded"). The Florida Supreme Court rejected Hall's appeal and held that Florida's 70-point threshold was constitutional. 109 So. 3d, at 707–708.

This Court granted certiorari. 571 U. S. ___ (2013).

## II

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment applies those restrictions to the States. *Roper* v. *Simmons*, 543 U. S. 551, 560 (2005); *Furman* v. *Georgia*, 408 U. S. 238, 239–240 (1972) (*per curiam*). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper, supra,* at 560; see also *Trop* v. *Dulles*, 356 U. S. 86, 100 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

The Eighth Amendment "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States*, 217 U. S. 349, 378 (1910). To enforce the Constitution's protection of human dignity, this Court looks to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, *supra*, at 101. The Eighth

Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.

The Eighth Amendment prohibits certain punishments as a categorical matter. No natural-born citizen may be denaturalized. *Ibid.* No person may be sentenced to death for a crime committed as a juvenile. *Roper*, *supra*, at 578. And, as relevant for this case, persons with intellectual disability may not be executed. *Atkins*, 536 U. S., at 321.

No legitimate penological purpose is served by executing a person with intellectual disability. *Id.,* at 317, 320. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy* v. *Louisiana*, 554 U. S. 407, 420 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. See *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). As for deterrence, those with intellectual disability are, by reason of their condition, likely unable to make the calculated judgments that are the premise for the deterrence rationale. They have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . . . [which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U. S., at 320. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. See *id.*, at 319 ("If the cul-

pability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution").

A further reason for not imposing the death penalty on a person who is intellectually disabled is to protect the integrity of the trial process. These persons face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel. *Id.*, at 320–321. This is not to say that under current law persons with intellectual disability who "meet the law's requirements for criminal responsibility" may not be tried and punished. *Id.,* at 306. They may not, however, receive the law's most severe sentence. *Id.,* at 318.

The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of *Atkins*. To determine if Florida's cutoff rule is valid, it is proper to consider the psychiatric and professional studies that elaborate on the purpose and meaning of IQ scores to determine how the scores relate to the holding of *Atkins*. This in turn leads to a better understanding of how the legislative policies of various States, and the holdings of state courts, implement the *Atkins* rule. That understanding informs our determination whether there is a consensus that instructs how to decide the specific issue presented here. And, in conclusion, this Court must express its own independent determination reached in light of the instruction found in those sources and authorities.

## III

### A

That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those

professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the diagnosis of persons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define and explain how to diagnose the mental condition at issue. And the definition of intellectual disability by skilled professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans. In determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions.

As the Court noted in *Atkins*, the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period. See *id.*, at 308, n. 3; DSM–5, at 33; Brief for American Psychological Association et al. as *Amici Curiae* 12–13 (hereinafter APA Brief). This last factor, referred to as "age of onset," is not at issue.

The first and second criteria—deficits in intellectual functioning and deficits in adaptive functioning—are central here. In the context of a formal assessment, "[t]he existence of concurrent deficits in intellectual and adaptive functioning has long been the defining characteristic of intellectual disability." *Id.,* at 11.

On its face, the Florida statute could be consistent with the views of the medical community noted and discussed in *Atkins*. Florida's statute defines intellectual disability for purposes of an *Atkins* proceeding as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Fla. Stat. §921.137(1) (2013). The statute further defines "signifi-

cantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." *Ibid.* The mean IQ test score is 100. The concept of standard deviation describes how scores are dispersed in a population. Standard deviation is distinct from standard error of measurement, a concept which describes the reliability of a test and is discussed further below. The standard deviation on an IQ test is approximately 15 points, and so two standard deviations is approximately 30 points. Thus a test taker who performs "two or more standard deviations from the mean" will score approximately 30 points below the mean on an IQ test, *i.e.*, a score of approximately 70 points.

On its face this statute could be interpreted consistently with *Atkins* and with the conclusions this Court reaches in the instant case. Nothing in the statute precludes Florida from taking into account the IQ test's standard error of measurement, and as discussed below there is evidence that Florida's Legislature intended to include the measurement error in the calculation. But the Florida Supreme Court has interpreted the provisions more narrowly. It has held that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited. See *Cherry* v. *State*, 959 So. 2d 702, 712–713 (Fla. 2007) (*per curiam*). That strict IQ test score cutoff of 70 is the issue in this case.

Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is

so even though the medical community accepts that all of
this evidence can be probative of intellectual disability,
including for individuals who have an IQ test score above
70.  See APA Brief 15–16 ("[T]he relevant clinical authori-
ties all agree that an individual with an IQ score above 70
may properly be diagnosed with intellectual disability if
significant limitations in adaptive functioning also exist");
DSM–5, at 37 ("[A] person with an IQ score above 70 may
have such severe adaptive behavior problems . . . that the
person's actual functioning is comparable to that of indi-
viduals with a lower IQ score").

   Florida's rule disregards established medical practice in
two interrelated ways.  It takes an IQ score as final and
conclusive evidence of a defendant's intellectual capacity,
when experts in the field would consider other evidence.
It also relies on a purportedly scientific measurement of
the defendant's abilities, his IQ score, while refusing to
recognize that the score is, on its own terms, imprecise.

   The professionals who design, administer, and interpret
IQ tests have agreed, for years now, that IQ test scores
should be read not as a single fixed number but as a
range.  See D. Wechsler, The Measurement of Adult Intel-
ligence 133 (3d ed. 1944) (reporting the range of error on
an early IQ test).  Each IQ test has a "standard error of
measurement," *ibid.*, often referred to by the abbreviation
"SEM."  A test's SEM is a statistical fact, a reflection of
the inherent imprecision of the test itself.  See R. Furr &
V. Bacharach, Psychometrics 118 (2d ed. 2014) (identify-
ing the SEM as "one of the most important concepts in
measurement theory").  An individual's IQ test score on
any given exam may fluctuate for a variety of reasons.
These include the test-taker's health; practice from earlier
tests; the environment or location of the test; the examin-
er's demeanor; the subjective judgment involved in scoring
certain questions on the exam; and simple lucky guessing.
See American Association on Intellectual and Develop-

mental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual); A. Kaufman, IQ Testing 101, pp. 138–139 (2009).

The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence level that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM–5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75 (70 ± 5)"); APA Brief 23 ("For example, the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Stanford-Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error)"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. See Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289–291, 318 (D. Saklofske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed,

or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

Despite these professional explanations, Florida law used the test score as a fixed number, thus barring further consideration of other evidence bearing on the question of intellectual disability. For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning. These include evidence of past performance, environment, and upbringing.

### B

A significant majority of States implement the protections of *Atkins* by taking the SEM into account, thus acknowledging the error inherent in using a test score without necessary adjustment. This calculation provides "objective indicia of society's standards" in the context of the Eighth Amendment. *Roper*, 543 U. S., at 563. Only the Kentucky and Virginia Legislatures have adopted a fixed score cutoff identical to Florida's. Ky. Rev. Stat. Ann. §532.130(2) (Lexis Supp. 2013); *Bowling* v. *Commonwealth*, 163 S. W. 3d 361, 375 (Ky. 2005); Va. Code Ann. §19.2–264.3:1.1 (Lexis Supp. 2013); *Johnson* v. *Commonwealth*, 267 Va. 53, 75, 591 S. E. 2d 47, 59 (2004), vacated and remanded on other grounds, 544 U. S. 901 (2005). Alabama also may use a strict IQ score cutoff at 70, although not as a result of legislative action. See *Smith* v. *State*, 71 So. 3d 12, 20 (Ala. Crim. App. 2008) ("The Alabama Supreme Court . . . did not adopt any 'margin of error' when examining a defendant's IQ score"). Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater, Tr. of Oral Arg. 9, and

so they are not included alongside Florida in this analysis.

In addition to these States, Arizona, Delaware, Kansas, North Carolina, and Washington have statutes which could be interpreted to provide a bright-line cutoff leading to the same result that Florida mandates in its cases. See Ariz. Rev. Stat. Ann. §13–753(F) (West 2013); Del. Code Ann. Tit. 11, §4209(d)(3) (2012 Supp.); Kan. Stat. Ann. §76–12b01 (2013 Supp.); N. C. Gen. Stat. Ann. §15A–2005 (Lexis 2013); Wash. Rev. Code §10.95.030(2)(c) (2012). That these state laws might be interpreted to require a bright-line cutoff does not mean that they will be so interpreted, however. See, *e.g.*, *State* v. *Vela*, 279 Neb. 94, 126, 137, 777 N. W. 2d 266, 292, 299 (2010) (Although Nebraska's statute specifies "[a]n intelligence quotient of seventy or below on a reliably administered intelligence quotient test," "[t]he district court found that [the defendant's] score of 75 on the [IQ test], considered in light of the standard error of measurement, could be considered as subaverage general intellectual functioning for purposes of diagnosing mental retardation").

Arizona's statute appears to set a broad statutory cutoff at 70, Ariz. Rev. Stat. Ann. §13–753(F) (West 2013), but another provision instructs courts to "take into account the margin of error for a test administered." *Id.* at §14-753(K)(5). How courts are meant to interpret the statute in a situation like Hall's is not altogether clear. The principal Arizona case on the matter, *State* v. *Roque*, 141 P. 3d 368, (Ariz 2006), states that "the statute accounts for margin of error by requiring multiple tests," and that "if the defendant achieves a full-scale score of 70 or below on any one of the tests, then the court proceeds to a hearing." *Id.* at 403. But that case also notes that the defendant had an IQ score of 80, well outside the margin of error, and that all but one of the sub-parts of the IQ test were "above 75." *Id.*

Kansas has not had an execution in almost five decades,

and so its laws and jurisprudence on this issue are unlikely to receive attention on this specific question. See *Atkins*, 536 U. S., at 316 ("[E]ven in those States that allow the execution of mentally retarded offenders, the practice is uncommon. Some States . . . continue to authorize executions, but none have been carried out in decades. Thus there is little need to pursue legislation barring the execution of the mentally retarded in those States"). Delaware has executed three individuals in the past decade, while Washington has executed one person, and has recently suspended its death penalty. None of the four individuals executed recently in those States appears to have brought a claim similar to that advanced here.

Thus, at most nine States mandate a strict IQ score cutoff at 70. Of these, four States (Delaware, Kansas, North Carolina, and Washington) appear not to have considered the issue in their courts. On the other side of the ledger stand the 18 States that have abolished the death penalty, either in full or for new offenses, and Oregon, which has suspended the death penalty and executed only two individuals in the past 40 years. See *Roper,* 543 U. S., at 574 ("[The] Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty"). In those States, of course, a person in Hall's position could not be executed even without a finding of intellectual disability. Thus in 41 States an individual in Hall's position—an individual with an IQ score of 71—would not be deemed automatically eligible for the death penalty.

These aggregate numbers are not the only considerations bearing on a determination of consensus. Consistency of the direction of change is also relevant. See *id.,* at 565–566 (quoting *Atkins*, *supra*, at 315). Since *Atkins*, many States have passed legislation to comply with the constitutional requirement that persons with intellectual disability not be executed. Two of these States, Virginia

and Delaware, appear to set a strict cutoff at 70, although as discussed, Delaware's courts have yet to interpret the law. In contrast, at least 11 States have either abolished the death penalty or passed legislation allowing defendants to present additional evidence of intellectual disability when their IQ test score is above 70.

Since *Atkins*, five States have abolished the death penalty through legislation. See 2012 Conn. Pub. Acts no. 12–5; Ill. Comp. Stat. ch. 725, §119–1 (West 2012); Md. Correc. Servs. Code Ann. §3–901 *et seq.* (Lexis 2008); N. J. Stat. Ann. §2C:11–3(b)(1) (West Supp. 2013); 2009 N. M. Laws ch. 11, §§5–7. In addition, the New York Court of Appeals invalidated New York's death penalty under the State Constitution in 2004, see *People* v. *LeValle*, 3 N. Y. 3d 88, 817 N. E. 2d 341 (2004), and legislation has not been passed to reinstate it. And when it did impose the death penalty, New York did not employ an IQ cutoff in determining intellectual disability. N. Y. Crim. Proc. Law Ann. §400.27(12)(e) (West 2005).

In addition to these States, at least five others have passed legislation allowing a defendant to present additional evidence of intellectual disability even when an IQ test score is above 70. See Cal. Penal Code Ann. §1376 (West Supp. 2014) (no IQ cutoff); Idaho Code §19–2515A (Lexis Supp. 2013) ("seventy (70) or below"); *Pizzutto* v. *State*, 146 Idaho 720, 729, 202 P. 3d 642, 651 (2008) ("The alleged error in IQ testing is plus or minus five points. The district court was entitled to draw reasonable inferences from the undisputed facts"); La. Code Crim. Proc. Ann., Art. 905.5.1 (West Supp. 2014) (no IQ cutoff); Nev. Rev. Stat. §174.098.7 (2013) (no IQ cutoff); Utah Code Ann §77–15a–102 (Lexis 2012) (no IQ cutoff). The U. S. Code likewise does not set a strict IQ cutoff. See 18 U. S. C. §3596(c). And no State that previously allowed defendants with an IQ score over 70 to present additional evidence of intellectual disability has modified its law to create a

strict cutoff at 70.  Cf. *Roper*, *supra*, at 566 ("Since *Stanford* v. *Kentucky*, 492 U. S. 361 (1989), no State that previously prohibited capital punishment for juveniles has reinstated it").

In summary, every state legislature to have considered the issue after *Atkins*—save Virginia's—and whose law has been interpreted by its courts has taken a position contrary to that of Florida.  Indeed, the Florida Legislature, which passed the relevant legislation prior to *Atkins*, might well have believed that its law would not create a fixed cutoff at 70.  The staff analysis accompanying the 2001 bill states that it "does not contain a set IQ level . . . .  Two standard deviations from these tests is approximately a 70 IQ, although it can be extended up to 75."  Fla. Senate Staff Analysis and Economic Impact Statement, CS/SB 238, p. 11 (Feb. 14, 2001).  But the Florida Supreme Court interpreted the law to require a bright-line cutoff at 70, see *Cherry*, 959 So. 2d, at 712–713, and the Court is bound by that interpretation.

The rejection of the strict 70 cutoff in the vast majority of States and the "consistency in the trend," *Roper*, *supra*, at 567, toward recognizing the SEM provide strong evidence of consensus that our society does not regard this strict cutoff as proper or humane.

## C

*Atkins* itself acknowledges the inherent error in IQ testing.  It is true that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation" falls within the protection of the Eighth Amendment. *Bobby* v. *Bies*, 556 U. S. 825, 831 (2009).  In *Atkins,* the Court stated:

> "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.  As was our approach in *Ford* v. *Wain-*

*wright* with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" 536 U. S., at 317 (quoting *Ford* v. *Wainwright*, 477 U. S. 399, 416–417 (1986); citation omitted).

As discussed above, the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed. But *Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection.

The *Atkins* Court twice cited definitions of intellectual disability which, by their express terms, rejected a strict IQ test score cutoff at 70. *Atkins* first cited the definition provided in the DSM–IV: "'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." 536 U. S., at 308, n. 3 (citing Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). The Court later noted that "'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" 536 U. S., at 309, n. 5. Furthermore, immediately after the Court declared that it left "'to the States the task of developing appropriate ways to enforce the constitutional restriction,'" *id.,* at 317, the Court stated in an accompanying footnote that "[t]he [state] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions," *ibid.*

Thus *Atkins* itself not only cited clinical definitions for intellectual disability but also noted that the States' standards, on which the Court based its own conclusion, conformed to those definitions. In the words of *Atkins,* those persons who meet the "clinical definitions" of intel-

lectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.*, at 318. Thus, they bear "diminish[ed] . . . personal culpability." *Ibid.* The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins.* And those clinical definitions have long included the SEM. See Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987) ("Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. Treating the IQ with some flexibility permits inclusion in the Mental Retardation category of people with IQs somewhat higher than 70 who exhibit significant deficits in adaptive behavior").

Respondent argues that the current Florida law was favorably cited by the *Atkins* Court. See Brief for Respondent 18 ("As evidence of the national consensus, the Court specifically cited Florida's statute at issue here, which has not substantively changed"). While *Atkins* did refer to Florida's law in a citation listing States which had outlawed the execution of the intellectually disabled, 536 U. S., at 315, that fleeting mention did not signal the Court's approval of Florida's current understanding of the law. As discussed above, when *Atkins* was decided the Florida Supreme Court had not yet interpreted the law to require a strict IQ cutoff at 70. That new interpretation runs counter to the clinical definition cited throughout *Atkins* and to Florida's own legislative report indicating this kind of cutoff need not be used.

Respondent's argument also conflicts with the logic of *Atkins* and the Eighth Amendment. If the States were to

have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. This Court thus reads *Atkins* to provide substantial guidance on the definition of intellectual disability.

D

The actions of the States and the precedents of this Court "give us essential instruction," *Roper*, 543 U. S., at 564, but the inquiry must go further. "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion). That exercise of independent judgment is the Court's judicial duty. See *Roper*, *supra,* at 574 ("[T]o the extent *Stanford* was based on a rejection of the idea that this Court is required to bring its independent judgment to bear on the proportionality of the death penalty for a particular class of crimes or offenders, it suffices to note that this rejection was inconsistent with prior Eighth Amendment decisions" (citation omitted).

In this Court's independent judgment, the Florida statute, as interpreted by its courts, is unconstitutional.

In addition to the views of the States and the Court's precedent, this determination is informed by the views of medical experts. These views do not dictate the Court's decision, yet the Court does not disregard these informed assessments. See *Kansas* v. *Crane*, 534 U. S. 407, 413 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations . . ."). It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic frame-

work. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins*, *supra,* at 309, n. 5, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

The flaws in Florida's law are the result of the inherent error in IQ tests themselves. An IQ score is an approximation, not a final and infallible assessment of intellectual functioning. See APA Brief 24 ("[I]t is standard pyschometric practice to report the 'estimates of relevant reliabilities and standard errors of measurement' when reporting a test score"); *ibid.* (the margin of error is "inherent to the accuracy of IQ scores"); Furr, Psychometrics, at 119 ("[T]he standard error of measurement is an important psychometric value with implications for applied measurement"). SEM is not a concept peculiar to the psychiatric profession and IQ tests. It is a measure that is recognized and relied upon by those who create and devise tests of all sorts. *Id.,* at 118 (identifying the SEM as "one of the most important concepts in measurement theory").

This awareness of the IQ test's limits is of particular

importance when conducting the conjunctive assessment necessary to assess an individual's intellectual ability. See American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports 40 (11th ed. 2010) ("It must be stressed that the diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination").

Intellectual disability is a condition, not a number. See DSM–5, at 37. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability. See APA Brief 17 ("Under the universally accepted clinical standards for diagnosing intellectual disability, the court's determination that Mr. Hall is not intellectually disabled cannot be considered valid").

This Court agrees with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.

It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment. See DSM–5, at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score"). The Florida statute, as interpreted by its courts, misuses IQ score on its own terms; and

this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishments Clause.

E

Florida seeks to execute a man because he scored a 71 instead of 70 on an IQ test. Florida is one of just a few States to have this rigid rule. Florida's rule misconstrues the Court's statements in *Atkins* that intellectually disability is characterized by an IQ of "approximately 70." 536 U. S., at 308, n. 3. Florida's rule is in direct opposition to the views of those who design, administer, and interpret the IQ test. By failing to take into account the standard error of measurement, Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry into adaptive functioning. Freddie Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime.

The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

The judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–10882

_____

## FREDDIE LEE HALL, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[May 27, 2014]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

In *Atkins* v. *Virginia*, 536 U. S. 304 (2002), the Court held that the Eighth Amendment prohibits a death sentence for defendants who are intellectually disabled but does not mandate the use of a single method for identifying such defendants. Today, the Court overrules the latter holding based largely on the positions adopted by private professional associations. In taking this step, the Court sharply departs from the framework prescribed in prior Eighth Amendment cases and adopts a uniform national rule that is both conceptually unsound and likely to result in confusion. I therefore respectfully dissent.

I

The Court's approach in this case marks a new and most unwise turn in our Eighth Amendment case law. In *Atkins* and other cases, the Court held that the prohibition of cruel and unusual punishment embodies the "evolving standards of decency that mark the progress of a maturing society," and the Court explained that "those evolving standards should be informed by objective factors to the maximum possible extent." *Id.,* at 312 (internal quotation marks omitted). In addition, the Court "pinpointed that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the coun-

try's legislatures." *Ibid.*

In these prior cases, when the Court referred to the evolving standards of a maturing "society," the Court meant the standards of *American society as a whole*. Now, however, the Court strikes down a state law based on the evolving standards of *professional societies*, most notably the American Psychiatric Association (APA). The Court begins its analysis with the views of those associations, see *ante*, at 7–12, and then, after briefly discussing the enactments of state legislatures, see *ante*, at 12–16, returns to the associations' views in interpreting *Atkins* and in exercising the Court's "independent judgment" on the constitutionality of Florida's law, see *ante*, at 16–22. This approach cannot be reconciled with the framework prescribed by our Eighth Amendment cases.

A

Under this Court's modern Eighth Amendment precedents, whether a punishment is "cruel and unusual" depends on currently prevailing societal norms, and the Court has long held that laws enacted by state legislatures provide the "clearest and most reliable objective evidence of contemporary values," *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989). This is so because "in a democratic society[,] legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people," *Gregg* v. *Georgia*, 428 U. S. 153, 175–176 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (internal quotation marks omitted). Under this approach, as originally conceived, the Court first asked whether a challenged practice contravened a clear national consensus evidenced by state legislation, and only if such a consensus was found would the Court go on and ask "whether there is reason to disagree with [the States'] judgment." *Atkins*, 536 U. S., at 313.

Invoking this two-step procedure, *Atkins* held that the

Eighth Amendment forbids the execution of defendants who are intellectually disabled. See *id.*, at 315–316. Critical to the Court's analysis was the conclusion that "today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.*, at 316. "This consensus," the Court continued, "unquestionably reflects widespread judgment about . . . the relationship between mental retardation and the penological purposes served by the death penalty." *Id.*, at 317.

While *Atkins* identified a consensus against the execution of the intellectually disabled, the Court observed that there was "serious disagreement" among the States with respect to the best method for "determining which offenders are in fact retarded." *Ibid.* The Court therefore "le[ft] to the States the task of developing appropriate ways" to identify these defendants. *Ibid.* (internal quotation marks and alteration omitted). As we noted just five years ago, *Atkins* "did not provide definitive procedural or substantive guides for determining when a person" is intellectually disabled. *Bobby* v. *Bies*, 556 U. S. 825, 831 (2009).

B

Consistent with the role that *Atkins* left for the States, Florida follows the procedure now at issue. As we explained in *Atkins*, in order for a defendant to qualify as intellectually disabled, three separate requirements must be met: It must be shown that a defendant has both (1) significantly subaverage intellectual functioning and (2) deficits in adaptive behavior, and that (3) the onset of both factors occurred before the age of 18. See 536 U. S., at 318; *ante*, at 8. In implementing this framework, Florida has determined that the first requirement cannot be satisfied if the defendant scores higher than 70 on IQ tests, the long-accepted method of measuring intellectual

functioning.[1]   The Court today holds that this scheme
offends the Eighth Amendment.  The Court objects that
Florida's approach treats IQ test scores as conclusive and
ignores the fact that an IQ score might not reflect "true"
IQ because of errors in measurement.  The Court then
concludes that a State must view a defendant's IQ as a
range of potential scores calculated using a statistical
concept known as the "standard error of measurement" or
SEM.  See Part II–B–1, *infra*.  The Court holds that if this
range includes an IQ of 70 or below (the accepted level for
intellectual disability), the defendant must be permitted to
produce other evidence of intellectual disability in addition
to IQ scores.

I see no support for this holding in our traditional ap-
proach for identifying our society's evolving standards of
decency.  Under any fair analysis of current state laws,
the same absence of a consensus that this Court found in
*Atkins* persists today.  It is telling that Hall himself does
not rely on a consensus among States.  He candidly argues
instead that "the precise number of States that share
Florida's approach is immaterial."  Reply Brief 2.

The Court's analysis is more aggressive.  According to
the Court, a "significant majority of States" reject Florida's
"strict 70 cutoff" and instead take "the SEM into account"
when deciding whether a defendant meets the first re-
quirement of the intellectual-disability test.  *Ante,* at 12,
16.  On the Court's count, "at most nine States mandate a
strict IQ score cutoff at 70"; 22 States allow defendants to
present "additional evidence" when an individual's test

_____

[1] See, *e.g.*, American Association of Intellectual and Developmental
Disabilities (AAIDD), Intellectual Disability 10–11 (11th ed. 2010)
(hereinafter AAIDD 11th ed.) (cataloguing history of IQ "cutoff criteria"
since 1959).  Earlier publications of the AAIDD were published under
its former name, the American Association on Mental Retardation
(hereinafter AAMR).

score is between 70 and 75, *ante*, at 20;[2] and 19 States have abolished the death penalty or have long suspended its operation. *Ante*, at 14. From these numbers, the Court concludes that "in 41 States" a defendant "with an IQ score of 71" would "not be deemed automatically eligible for the death penalty." *Ibid.*[3] This analysis is deeply flawed.

To begin, in addition to the 8 other States that the Court recognizes as having rules similar to Florida's, 1 more, Idaho, does not appear to require courts to take the SEM into account in rejecting a claim of intellectual disability.[4] And of the remaining 21 States with the death penalty, 9 have either said nothing about the SEM or have not clarified whether they require its use.[5] Accordingly, of the

_____

[2] I assume that by "additional evidence" the Court means evidence other than further IQ testing because Florida's rule already "allows for multiple evaluations, and . . . [petitioner] could have sought still more testing." Brief for Respondent 44. See also Brief for Petitioner 50; App. 107–108.

[3] As I discuss below, the Florida Supreme Court did not base its decision on a finding that Hall's IQ was 71. The Florida courts considered several IQ scores, all above 70. See App. 107–108; Brief for Petitioner 50.

[4] See Idaho Code §19–2515A(1)(b) (Lexis Cum. Supp. 2013); *Pizzuto* v. *State*, 146 Idaho 720, 729, 202 P. 3d 642, 651 (2008) (stating that "the legislature did not require that the IQ score be within five points of 70 or below" and giving the District Court discretion to interpret the defendant's IQ).

[5] Montana, New Hampshire, and Wyoming have not ruled on the subject. Two States have not defined "significantly subaverage" intellectual functioning. See Colo. Rev. Stat. Ann. §18–1.3–1101(2) (2013); S. C. Code Ann. §16–3–20 (2003 and 2013 Cum. Supp.); *Franklin* v. *Maynard*, 356 S. C. 276, 278–279, 588 S. E. 2d 604, 605 (2003) (*per curiam*). Two States have statutes that impose rebuttable presumptions of intellectual disability if a defendant's IQ is below 65 or 70 but have not said whether a defendant would be allowed to provide further evidence if his IQ were over 70. See Ark. Code Ann. §5–4–618 (2013); Neb. Rev. Stat. §28–105.01 (2013 Supp.). One State's Supreme Court mentioned measurement errors but only to explain why a defendant

death-penalty states, 10 (including Florida) do not require that the SEM be taken into account, 12 consider the SEM, and 9 have not taken a definitive position on this question. These statistics cannot be regarded as establishing a national consensus against Florida's approach.

Attempting to circumvent these statistics, the Court includes in its count the 19 States that never impose the death penalty, but this maneuver cannot be justified. It is true that the Court has counted non-death-penalty States in some prior Eighth Amendment cases, but those cases concerned the substantive question whether a class of individuals should be categorically ineligible for the death penalty. In *Roper* v. *Simmons*, 543 U. S. 551 (2005), for example, the Court counted non-death-penalty States as part of the consensus against the imposition of a capital sentence for a crime committed by a minor. *Id.,* at 574. The Court reasoned that a State's decision to abolish the death penalty necessarily "demonstrates a judgment that the death penalty is inappropriate for all offenders, including juveniles." *Ibid.*

No similar reasoning is possible here. The fact that a State has abolished the death penalty says nothing about how that State would resolve the evidentiary problem of identifying defendants who are intellectually disabled. As I explain below, a State may reasonably conclude that Florida's approach is fairer than and just as accurate as the approach that the Court now requires, and therefore it cannot be inferred that a non-death-penalty State, if forced to choose between the two approaches, would necessarily select the Court's. For all these reasons, it is quite

————————

must prove deficits in adaptive behavior despite having an IQ below 70. See *Stripling* v. *State*, 261 Ga. 1, 3, 401 S. E. 2d 500, 504 (1991). Another State's Supreme Court mentioned the SEM in responding to an argument by the defendant, but it did not suggest that the SEM was legally relevant. See *Goodwin* v. *State*, 191 S. W. 3d 20, 30–31, and n. 7 (Mo. 2006).

wrong for the Court to proclaim that "the vast majority of States" have rejected Florida's approach. *Ante*, at 16.

Not only are the States divided on the question whether the SEM should play a role in determining whether a capital defendant is intellectually disabled, but the States that require consideration of the SEM do not agree on the role that the SEM should play. Those States differ, for example, on the sort of evidence that can be introduced when IQ testing reveals an IQ over 70. Some require further evidence of *intellectual* deficits, while others permit the defendant to move on to the second prong of the test and submit evidence of deficits in *adaptive* behavior.[6] The fairest assessment of the current situation is that the States have adopted a multitude of approaches to a very difficult question.

In light of all this, the resolution of this case should be straightforward: Just as there was no methodological consensus among the States at the time of *Atkins*, there is no such consensus today. And in the absence of such a consensus, we have no basis for holding that Florida's method contravenes our society's standards of decency.

## C

Perhaps because it recognizes the weakness of its arguments about a true national consensus, the Court places heavy reliance on the views (some only recently announced) of professional organizations, but the Court attempts to downplay the degree to which its decision is dependent upon the views of these private groups. In a game attempt to shoehorn the views of these associations into the national-consensus calculus, the Court reasons as follows. The views of these associations, the Court states, help in determining "how [IQ] scores relate to the holding

---

[6] Compare *Ybarra* v. *State*, 127 Nev. \_\_\_, \_\_\_, 247 P. 3d 269, 274 (2011), with *State* v. *Dunn*, 2001–1635, pp. 25–26 (La. 5/11/10), 41 So. 3d 454, 470.

in *Atkins"*; "[t]his in turn leads to a better understanding of how the legislative policies of various States, and the holdings of state courts, implement the *Atkins* rule"; and "[t]hat understanding informs our determination whether there is a consensus that instructs how to decide the specific issue presented here." *Ante*, at 7.

I cannot follow the Court's logic. Under our modern Eighth Amendment cases, what counts are our society's standards—which is to say, the standards of the American people—not the standards of professional associations, which at best represent the views of a small professional elite.

The Court also mistakenly suggests that its methodology is dictated by *Atkins*. See *ante*, at 16–19. On the contrary, *Atkins* expressly left "to the States" the task of defining intellectual disability. And although the *Atkins* Court perceived a "professional consensus" about the best procedure to be used in identifying the intellectually disabled, the *Atkins* Court declined to import that view into the law. 536 U. S., at 316, n. 21. Instead, the Court made clear that this professional consensus was "by no means dispositive." *Id.,* at 317, n. 21; see *id.*, at 317, and n. 22.

D

The Court's reliance on the views of professional associations will also lead to serious practical problems. I will briefly note a few.

First, because the views of professional associations often change,[7] tying Eighth Amendment law to these views will lead to instability and continue to fuel protracted litigation. This danger is dramatically illustrated by the most recent publication of the APA, on which the Court relies. This publication fundamentally alters the

--------

[7] See Forensic Psychology and Neuropsychology for Criminal and Civil Cases 57 (H. Hall ed. 2008) (hereinafter Forensic Psychology).

first prong of the longstanding, two-pronged definition of intellectual disability that was embraced by *Atkins* and has been adopted by most States. In this new publication, the APA discards "significantly subaverage intellectual functioning" as an element of the intellectual-disability test.[8] Elevating the APA's current views to constitutional significance therefore throws into question the basic approach that *Atkins* approved and that most of the States have followed.

It is also noteworthy that changes adopted by professional associations are sometimes rescinded. For example, in 1992 the AAIDD extended the baseline "intellectual functioning cutoff" from an "IQ of 70 or below" to a "score of approximately 70 to 75 or below." AAIDD 11th ed. 10 (Table 1.3) (boldface deleted); see 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 3449 (B. Sadock, V. Sadock, & P. Ruiz eds., 9th ed. 2009) (hereinafter Kaplan & Sadock's). That change "generated much controversy'; by 2000, "only 4 states used the 1992 AAIDD definition, with 44 states continuing to use the 1983 definition." *Ibid.* And in the 2002 AAIDD, the baseline "IQ cut-off was changed" back to approximately "70 or less." *Ibid.*

Second, the Court's approach implicitly calls upon the Judiciary either to follow every new change in the thinking of these professional organizations or to judge the validity of each new change. Here, for example, the Court tacitly makes the judgment that the diagnostic criteria for intellectual disability that prevailed at the time when *Atkins* was decided are no longer legitimate. The publications that *Atkins* cited differ markedly from more recent

───────────

[8] Compare APA, Diagnostic and Statistical Manual of Mental Disorders 39, 41, 42 (rev. 4th ed. 2000) (hereinafter DSM–IV–TR), with APA, Diagnostic and Statistical Manual of Mental Disorders 33, 809 (5th ed. 2013) (hereinafter DSM–5).

editions now endorsed by the Court. See 536 U. S., at 308, n. 3.

Third, the Court's approach requires the Judiciary to determine which professional organizations are entitled to special deference. And what if professional organizations disagree? The Court provides no guidance for deciding which organizations' views should govern.

Fourth, the Court binds Eighth Amendment law to definitions of intellectual disability that are promulgated for use in making a variety of decisions that are quite different from the decision whether the imposition of a death sentence in a particular case would serve a valid penological end. In a death-penalty case, intellectual functioning is important because of its correlation with the ability to understand the gravity of the crime and the purpose of the penalty, as well as the ability to resist a momentary impulse or the influence of others. See *id.*, at 318, 320. By contrast, in determining eligibility for social services, adaptive functioning may be much more important. Cf. DSM–IV–TR, at xxxvii (clinical "considerations" may not be "relevant to legal judgments" that turn on "individual responsibility"); DSM–5, at 20 (similar). Practical problems like these call for legislative judgments, not judicial resolution.

## II

Because I find no consensus among the States, I would not independently assess the method that Florida has adopted for determining intellectual disability. But even if it were appropriate for us to look beyond the evidence of societal standards, I could not conclude that Florida's method is unconstitutional. The Court faults Florida for "tak[ing] an IQ score as final and conclusive evidence of a defendant's intellectual capacity" and for failing to recognize that an IQ score may be imprecise. *Ante*, at 10. In my view, however, Florida has adopted a sensible stand-

ard that comports with the longstanding belief that IQ tests are the best measure of intellectual functioning. And although the Court entirely ignores this part of the Florida scheme, the State takes into account the inevitable risk of testing error by permitting defendants to introduce multiple scores.

In contrast, the Court establishes a standard that conflates what have long been understood to be two *independent* requirements for proving intellectual disability: (1) significantly subaverage intellectual functioning and (2) deficits in adaptive behavior. The Court also mandates use of an alternative method of dealing with the risk of testing error without any hint that it is more accurate than Florida's approach.

## A

### 1

The first supposed error that the Court identifies is that Florida "takes an IQ score" as "conclusive evidence" of intellectual functioning. *Ante*, at 10. As an initial matter, one would get the impression from reading the Court's opinion that Hall introduced only one test score (of 71). See *ante*, at 14. In truth, the Florida courts considered multiple scores, all above 70, on the particular IQ test that Hall has dubbed the "gold standard." See Brief for Petitioner 50; App. 107–108.[9] Florida's statute imposes no limit on the number of IQ scores that a defendant may introduce, so the Court is simply wrong to analyze the Florida system as one that views a *single* IQ score above 70 as "final and conclusive evidence" that a defendant does not suffer from subaverage intellectual functioning. See

_____

[9] See Brief for Petitioner 50 (listing his valid IQ scores of 71, 72, 73, and 80). Hall alleges that he also scored a 69 on a Wechsler test, but that score was not admitted into evidence because of doubts about its validity. App. 107. Hall does not allege that any potential "practice effect" skewed his scores.

Brief for Respondent 44 ("Florida's Rule allows for multiple evaluations, and if Hall believed a statistical error rate prevented any of his tests from reflecting his true score, he could have sought still more testing").

The proper question to ask, therefore, is whether Florida's actual approach falls outside the range of discretion allowed by *Atkins.* The Court offers no persuasive reason for concluding that it does. Indeed, the Court's opinion never identifies what other evidence of intellectual functioning it would require Florida to admit. As we recognized in *Atkins,* the longstanding practices of the States, and at least the previous views of professional organizations, seem to reflect the understanding that IQ scores are the best way to measure intellectual functioning. See 536 U. S., at 316.[10] Until its most recent publication, the APA, for example, ranked the severity of intellectual disability exclusively by IQ scores, necessarily pinpointing the onset of the disability according to IQ. See DSM–IV–TR, at 42.

We have been presented with no solid evidence that the longstanding reliance on multiple IQ test scores as a measure of intellectual functioning is so unreasonable or outside the ordinary as to be unconstitutional. The Court has certainly not supplied any such information.

2

If the Court had merely held that Florida must permit defendants to introduce additional evidence (whatever that might be) of significantly subaverage intellectual

––––––––––

[10] See AAIDD 11th ed. 10 (cataloguing history of IQ "cutoff criteria" since 1959); DSM–IV–TR, at 39 ("Mental Retardation" is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) . . ." (boldface deleted)); *id.,* at 41 ("General intellectual functioning is defined by the intelligence quotient . . ." (italics deleted)); AAMR, Mental Retardation 14 (10th ed. 2002) (hereinafter AAMR 10th ed.) ("[I]ntellectual functioning is still best represented by IQ scores . . .").

functioning, its decision would be more limited in scope. But as I understand the Court's opinion, it also holds that when IQ tests reveal an IQ between 71 and 75, defendants must be allowed to present evidence of deficits in *adaptive behavior*—that is, the *second* prong of the intellectual-disability test. See *ante*, at 9–10, 12, 20. That is a remarkable change in what we took to be a universal understanding of intellectual disability just 12 years ago.

In *Atkins*, we instructed that "clinical definitions of mental retardation require *not only* [(1)] subaverage intellectual functioning, *but also* [(2)] significant limitations in adaptive skills." 536 U. S., at 318 (emphasis and alterations added). That is the approach taken by the vast majority of States.[11] As the Court correctly recognizes, most States require "*concurrent* deficits" in intellectual functioning and adaptive behavior, requiring defendants to prove *both*. *Ante*, at 8 (emphasis added).[12]

Yet the Court now holds that when a defendant's IQ score is as high as 75, a court must "consider factors indicating whether the person has deficits in adaptive functioning." *Ante*, at 12; see *ante*, at 9–10, 20. In other words, even when a defendant has failed to show that he meets the first prong of the well-accepted standard for intellectual disability (significantly subaverage intellectual functioning), evidence of the second prong (deficits in adaptive behavior) can establish intellectual disability.

The Court offers little explanation for this sea change.

―――――――

[11] See, *e.g.*, Del. Code Ann., Tit. 11, §4209 (2007); Idaho Code §19–2515A; Nev. Rev. Stat. §174.098 (2013); Va. Code Ann. §19.2–264.3:1.1 (Lexis Cum. Supp. 2013).

[12] The longstanding views of professional organizations have also been that intellectual functioning and adaptive behavior are independent factors. See, *e.g.*, DSM–IV–TR, at 39. These organizations might recommend examining evidence of adaptive behavior even when an IQ is above 70, but that sheds no light on what the *legal* rule should be given that most States appear to require defendants to prove each prong separately by a preponderance of the evidence.

It asserts vaguely that "[i]t is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." *Ante*, at 21. But the Court ignores the fact that deficits in adaptive behavior cannot be used to establish deficits in mental functioning because the two prongs are meant to show distinct components of intellectual disability. "[I]ntellectual functions" include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience," while adaptive functioning refers to the ability "to meet developmental and sociocultural standards for personal independence and social responsibility." DSM–5, at 33. Strong evidence of a deficit in adaptive behavior does not necessarily demonstrate a deficit in intellectual functioning. And without the latter, a person simply cannot be classified as intellectually disabled.

It is particularly troubling to relax the proof requirements for the intellectual-functioning prong because that is the prong that most directly relates to the concerns that led to our primary holding in *Atkins*. There, we explained that "the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses"—*i.e.*, diminished *intellectual* functioning—"make it less likely that [a defendant] can process the information of the possibility of execution as a penalty" and therefore be deterred from committing murders. 536 U. S., at 320; see also *id.*, at 318 ("[T]hey often act on impulse rather than pursuant to a premeditated plan . . ."); see also *ante,* at 6. A defendant who does not display significantly subaverage intellectual functioning is therefore not among the class of defendants we identified in *Atkins.*

Finally, relying primarily on proof of adaptive deficits will produce inequities in the administration of capital punishment. As far as I can tell, adaptive behavior is a malleable factor without "firm theoretical and empirical

roots." See 2 Kaplan & Sadock's 3448. No consensus exists among States or medical practitioners about what facts are most critical in analyzing that factor, and its measurement relies largely on subjective judgments. Florida's approach avoids the disparities that reliance on such a factor tends to produce. It thus promotes consistency in the application of the death penalty and confidence that it is not being administered haphazardly.

## B

The Court's second "interrelated" objection to Florida's rule is that it fails to account for the risk of error inherent in IQ testing. In order to diminish this risk, the Court establishes a rule that if IQ testing reveals an IQ between 71 and 75, a claim of intellectual disability cannot be rejected on the basis of test scores alone. *Ante,* at 20. The Court both misunderstands how the SEM works and fails to explain why Florida's method of accounting for the risk of error (allowing a defendant to take and rely on multiple tests) is not as effective as the approach that the Court compels.

## 1

The Court begins with the simple and uncontroversial proposition that every testing situation is susceptible to error and thus may result in an imperfect measurement of "true" IQ. The Court then wades into technical matters that must be understood in order to see where the Court goes wrong.

There are various ways to account for error in IQ testing. One way is Florida's approach (evaluate multiple test results). Another is to use a mathematical measurement called the "standard error of measurement" or SEM. See AAMR 10th ed. 67–71 (App. 4.1). Of critical importance, there is not a single, uniform SEM across IQ tests or even across test-takers. Rather, "the [SEM] varies by test,

subgroup, and age group." User's Guide To Accompany AAIDD 11th ed.: Definition, Classification, and Systems of Supports 22 (2012).

Once we know the SEM for a particular test and a particular test-taker, adding *one* SEM to and subtracting *one* SEM from the obtained score establishes an interval of scores known as the 66% confidence interval. See AAMR 10th ed. 57. That interval represents the range of scores within which "we are [66%] sure" that the "true" IQ falls. See Oxford Handbook of Child Psychological Assessment 291 (D. Saklofske, C. Reynolds, & V. Schwean eds. 2013). The interval is centered on the obtained score, and it includes scores that are above and below that score by the amount of the SEM. Since there is about a 66% chance that the test-taker's "true" IQ falls within this range, there is about a 34% chance that the "true" IQ falls outside the interval, with approximately equal odds that it falls above the interval (17%) or below the interval (17%).

An example: If a test-taker scores a 72 on an IQ test with a SEM of 2, the 66% confidence interval is the range of 70 to 74 (72 ± 2). In this situation, there is approximately a 66% chance that the test-taker's "true" IQ is between 70 and 74; roughly a 17% chance that it is above 74; and roughly a 17% chance that it is 70 or below. Thus, there is about an 83% chance that the score is above 70.

Similarly, using *two* SEMs, we can build a 95% confidence interval. The process is the same except that we add two SEMs to and subtract two SEMS from the obtained score. To illustrate the use of two SEMs, let us hypothesize a case in which the defendant's obtained score is 74. With the same SEM of 2 as in the prior example, there would be a 95% chance that the true score is between 70 and 78 (74 ± 4); roughly a 2.5% chance that the score is above 78; and about a 2.5% chance that the score is 70 or below. The probability of a true score above 70 would be roughly 97.5%. As these two examples show, the

greater the degree of confidence demanded, the greater the range of scores that will fall within the confidence interval and, therefore, the further away from 70 an obtained score could be and yet still have 70 fall within its confidence interval.

2

The Court misunderstands these principles and makes factual mistakes that will surely confuse States attempting to comply with its opinion.

First, the Court unjustifiably assumes a blanket (or very common) error measurement of 5. See *ante*, at 20. That assumption gives rise to the Court's holding that a defendant must be permitted to introduce additional evidence when IQ tests reveal an IQ as high as 75. See *ibid.* SEMs, however, vary by IQ test and test-taker, and there is no reason to assume a SEM of 5 points; indeed, it appears that the SEM is generally "estimated to be three to five points" for well-standardized IQ tests. AAMR 10th ed. 57. And we know that the SEM for Hall's most recent IQ test was 2.16—less than half of the Court's estimate of 5. Brief for Petitioner 40, n. 17.

Relatedly, the Court misreads the authorities on which it relies to establish this cutoff IQ score of 75. It is true that certain professional organizations have advocated a cutoff of 75 and that *Atkins* cited those organizations' cutoff. See *ante,* at 12, 20. But the Court overlooks a critical fact: Those organizations endorsed a 75 IQ cutoff based on their express understanding that "*one* standard error of measurement [SEM]" is "three to five points for well-standardized" IQ tests. AAMR, Mental Retardation 37 (9th ed. 1992) (hereinafter AAMR 9th ed.); *Atkins*, 536 U. S., 309, n. 5 (citing AAMR 9th ed.; 2 Kaplan & Sadock's 2592 (B. Sadock & V. Sadock eds., 7th ed. 2000)); see also AAMR 10th ed. 57; AAIDD 11th ed. 36. In other words, the number 75 was relevant only to the extent that a

*single* SEM was "estimated" to be as high as 5 points. AAMR 9th ed. 37. Here, by contrast, we know that the SEM for Hall's latest IQ test was less than half of that estimate; there is no relevance to the number 75 in this case. To blindly import a five-point margin of error when we know as a matter of fact that the relevant SEM is 2.16 amounts to requiring consideration of more than *two* SEMs—an approach that finds no support in *Atkins* or anywhere else.

Because of these factual errors and ambiguities, it is unclear to me whether the Court concludes that a defendant is constitutionally entitled to introduce non-test evidence of intellectual disability (1) whenever his score is 75 or lower, on the mistaken understanding that the SEM for most tests is 5; (2) when the 66% confidence interval (using one SEM) includes a score of 70; or (3) when the 95% confidence interval (using two SEMs) includes a score of 70. In my view, none of these approaches is defensible.

An approach tied to a fixed score of 75 can be dismissed out of hand because, as discussed, every test has a different SEM.

The other two approaches would require that a defendant be permitted to submit additional evidence when his IQ is above 70 so long as the 66% or 95% confidence interval (using one SEM or two SEMs, respectively) includes a score of 70, but there is no foundation for this in our Eighth Amendment case law. As Hall concedes, the Eighth Amendment permits States to assign to a defendant the burden of establishing intellectual disability by at least a preponderance of the evidence. See Tr. of Oral Arg. 12. In other words, a defendant can be required to prove that the probability of a 70 or sub-70 IQ is greater than 50%. Under the Court's approach, by contrast, a defendant could prove significantly subaverage intellectual functioning by showing simply that the probability of a "true" IQ of 70 or below is as little as 17% (under a one-SEM

rule) or 2.5% (under a two-SEM rule). This totally transforms the allocation and nature of the burden of proof.

I have referred to the 66% and 95% confidence intervals only because they result from the most straightforward application of the SEM in this context: One SEM establishes the 66% confidence interval; two SEMs establish the 95% confidence interval. See AAIDD 11th ed. 36. But it would be simple enough to devise a 51% confidence interval—or a 99% confidence interval for that matter. There is therefore no excuse for mechanically imposing standards that are unhinged from legal logic and that override valid state laws establishing burdens of proof. The appropriate confidence level is ultimately a judgment best left to legislatures, and their judgment has been that a defendant must establish that it is more likely than not that he is intellectually disabled. I would defer to that determination.

### 3

The Court also fails to grasp that Florida's system already accounts for the risk of testing error by allowing the introduction of multiple test scores. The Court never explains why its criticisms of the uncertainty resulting from the use of a *single* IQ score apply when a defendant consistently scores above 70 on *multiple* tests. Contrary to the Court's evident assumption, the well-accepted view is that multiple consistent scores establish a much higher degree of confidence.[13]

--------

[13] See Oxford Handbook of Child Psychological Assessment 291 (D. Saklofske, C. Reynolds, & V. Schwean eds. 2013) (multiple scores provide "greater precision"); A. Frances, Essentials of Psychiatric Diagnosis: Responding to the Challenge of DSM–5, p. 31 (rev. ed. 2013) ("The pattern of test scores is more important than the score on any given test"). When there are multiple scores, moreover, there is good reason to treat low scores differently from high scores: "Although one cannot do better on an IQ test than one is capable of doing, one can certainly do worse." Forensic Psychology 56. ("[A] sharp, unexplained

The Court's only attempt to address this is to say that "the analysis of multiple IQ scores jointly is a complicated endeavor," *ante*, at 11, but any evaluation of intellectual disability, whether based on objective tests or subjective observations, is "complicated." If conducting the proper analysis of multiple scores produces an IQ as reliable as the approach mandated by the Court, there is no basis for rejecting Florida's approach.[14]

\* \* \*

For these reasons, I would affirm the judgment of the Florida Supreme Court.

---

drop in IQ scores following incarceration can be strong evidence of malingering"); Frances, *supra,* at 31 ("[H]igher scores are likely to be the more indicative, since there are many reasons why a given score might underestimate a person's intelligence, but no reason why scores should overestimate it").

[14] The Court also states that because IQ testing itself may be flawed, "multiple examinations may result in repeated similar scores" that are "not conclusive evidence of intellectual functioning." *Ante*, at 12. That argument proves too much: If potential flaws in administering multiple tests are sufficient to render them inaccurate, the Court should conclude that even scores of 90 or 100 are not sufficient. The appropriate remedy for incorrectly administered tests is for a court to disregard those tests, not to ignore the well-established fact that multiple, properly administered tests yielding scores above 70 can give a high degree of confidence that an individual is not intellectually disabled.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–10882

FREDDIE LEE HALL, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[May 27, 2014]

JUSTICE KENNEDY delivered the opinion of the Court.

This Court has held that the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. *Atkins* v. *Virginia*, 536 U. S. 304, 321 (2002). Florida law defines intellectual disability to require an IQ test score of 70 or less. If, from test scores, a prisoner is deemed to have an IQ above 70, all further exploration of intellectual disability is foreclosed. This rigid rule, the Court now holds, creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional.

I

On February 21, 1978, Freddie Lee Hall, petitioner here, and his accomplice, Mark Ruffin, kidnaped, beat, raped, and murdered Karol Hurst, a pregnant, 21-year-old newlywed. Afterward, Hall and Ruffin drove to a convenience store they planned to rob. In the parking lot of the store, they killed Lonnie Coburn, a sheriff's deputy who attempted to apprehend them. Hall received the death penalty for both murders, although his sentence for the Coburn murder was later reduced on account of insufficient evidence of premeditation. *Hall* v. *Florida*, 403

So. 2d 1319, 1321 (Fla. 1981) (*per curiam*).

Hall argues that he cannot be executed because of his intellectual disability. Previous opinions of this Court have employed the term "mental retardation." This opinion uses the term "intellectual disability" to describe the identical phenomenon. See Rosa's Law, 124 Stat. 2643 (changing entries in the U. S. Code from "mental retardation" to "intellectual disability"); Schalock et. al, The Renaming of *Mental Retardation*: Understanding the Change to the Term *Intellectual Disability*, 45 Intellectual & Developmental Disabilities 116 (2007). This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts; the manual is often referred to by its initials "DSM," followed by its edition number, *e.g.,* "DSM–5." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013).

When Hall was first sentenced, this Court had not yet ruled that the Eighth Amendment prohibits States from imposing the death penalty on persons with intellectual disability. See *Penry* v. *Lynaugh*, 492 U. S. 302, 340 (1989). And at the time, Florida law did not consider intellectual disability as a statutory mitigating factor.

After this Court held that capital defendants must be permitted to present nonstatutory mitigating evidence in death penalty proceedings, *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987), Hall was resentenced. Hall then presented substantial and unchallenged evidence of intellectual disability. School records indicated that his teachers identified him on numerous occasions as "[m]entally retarded." App. 482–483. Hall had been prosecuted for a different, earlier crime. His lawyer in that matter later testified that the lawyer "[c]ouldn't really understand anything [Hall] said." *Id.*, at 480. And, with respect to the murder trial given him in this case, Hall's counsel recalled

that Hall could not assist in his own defense because he had "'a mental . . . level much lower than his age,'" at best comparable to the lawyer's 4-year-old daughter. Brief for Petitioner 11. A number of medical clinicians testified that, in their professional opinion, Hall was "significantly retarded," App. 507; was "mentally retarded," *id.,* at 517; and had levels of understanding "typically [seen] with toddlers," *id.,* at 523.

As explained below in more detail, an individual's ability or lack of ability to adapt or adjust to the requirements of daily life, and success or lack of success in doing so, is central to the framework followed by psychiatrists and other professionals in diagnosing intellectual disability. See DSM–5, at 37. Hall's siblings testified that there was something "very wrong" with him as a child. App. 466. Hall was "slow with speech and . . . slow to learn." *Id.*, at 490. He "walked and talked long after his other brothers and sisters," *id.*, at 461, and had "great difficulty forming his words," *id.*, at 467.

Hall's upbringing appeared to make his deficits in adaptive functioning all the more severe. Hall was raised—in the words of the sentencing judge—"under the most horrible family circumstances imaginable." *Id.*, at 53. Although "[t]eachers and siblings alike immediately recognized [Hall] to be significantly mentally retarded . . . [t]his retardation did not garner any sympathy from his mother, but rather caused much scorn to befall him." *Id.*, at 20. Hall was "[c]onstantly beaten because he was 'slow' or because he made simple mistakes." *Ibid.* His mother "would strap [Hall] to his bed at night, with a rope thrown over a rafter. In the morning, she would awaken Hall by hoisting him up and whipping him with a belt, rope, or cord." *Ibid.* Hall was beaten "ten or fifteen times a week sometimes." *Id.,* at 477. His mother tied him "in a 'croaker' sack, swung it over a fire, and beat him," "buried him in the sand up to his neck to 'strengthen his legs,'" and

"held a gun on Hall . . . while she poked [him] with sticks." *Hall* v. *Florida*, 614 So. 2d 473, 480 (Fla. 1993) (Barkett, C. J., dissenting).

The jury, notwithstanding this testimony, voted to sentence Hall to death, and the sentencing court adopted the jury's recommendation. The court found that there was "substantial evidence in the record" to support the finding that "Freddie Lee Hall has been mentally retarded his entire life." App. 46. Yet the court also "suspect[ed] that the defense experts [were] guilty of some professional overkill," because "[n]othing of which the experts testified could explain how a psychotic, mentally-retarded, brain-damaged, learning-disabled, speech-impaired person could formulate a plan whereby a car was stolen and a convenience store was robbed." *Id.*, at 42. The sentencing court went on to state that, even assuming the expert testimony to be accurate, "the learning disabilities, mental retardation, and other mental difficulties . . . cannot be used to justify, excuse or extenuate the moral culpability of the defendant in this cause." *Id.*, at 56. Hall was again sentenced to death. The Florida Supreme Court affirmed, concluding that "Hall's argument that his mental retardation provided a pretense of moral or legal justification" had "no merit." *Hall*, 614 So. 2d, at 478. Chief Justice Barkett dissented, arguing that executing a person with intellectual disability violated the State Constitution's prohibition on cruel and unusual punishment. *Id.,* at 481–482.

In 2002, this Court ruled that the Eighth Amendment prohibited the execution of persons with intellectual disability. *Atkins* v. *Virginia*, 536 U. S., at 321. On November 30, 2004, Hall filed a motion claiming that he had intellectual disability and could not be executed. More than five years later, Florida held a hearing to consider Hall's motion. Hall again presented evidence of intellectual disability, including an IQ test score of 71. (Hall had received

nine IQ evaluations in 40 years, with scores ranging from 60 to 80, Brief for Respondent 8, but the sentencing court excluded the two scores below 70 for evidentiary reasons, leaving only scores between 71 and 80. See App. 107; 109 So. 3d 704, 707 (Fla. 2012)). In response, Florida argued that Hall could not be found intellectually disabled because Florida law requires that, as a threshold matter, Hall show an IQ test score of 70 or below before presenting any additional evidence of his intellectual disability. App. 278–279 ("[U]nder the law, if an I. Q. is above 70, a person is not mentally retarded"). The Florida Supreme Court rejected Hall's appeal and held that Florida's 70-point threshold was constitutional. 109 So. 3d, at 707–708.

This Court granted certiorari. 571 U. S. ___ (2013).

## II

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment applies those restrictions to the States. *Roper* v. *Simmons*, 543 U. S. 551, 560 (2005); *Furman* v. *Georgia*, 408 U. S. 238, 239–240 (1972) (*per curiam*). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper, supra,* at 560; see also *Trop* v. *Dulles*, 356 U. S. 86, 100 (1958) (plurality opinion) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

The Eighth Amendment "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Weems* v. *United States*, 217 U. S. 349, 378 (1910). To enforce the Constitution's protection of human dignity, this Court looks to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, *supra*, at 101. The Eighth

Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.

The Eighth Amendment prohibits certain punishments as a categorical matter. No natural-born citizen may be denaturalized. *Ibid.* No person may be sentenced to death for a crime committed as a juvenile. *Roper*, *supra*, at 578. And, as relevant for this case, persons with intellectual disability may not be executed. *Atkins*, 536 U. S., at 321.

No legitimate penological purpose is served by executing a person with intellectual disability. *Id.,* at 317, 320. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. "[P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy* v. *Louisiana*, 554 U. S. 407, 420 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. See *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). As for deterrence, those with intellectual disability are, by reason of their condition, likely unable to make the calculated judgments that are the premise for the deterrence rationale. They have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . . . [which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U. S., at 320. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. See *id.,* at 319 ("If the cul-

pability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution").

A further reason for not imposing the death penalty on a person who is intellectually disabled is to protect the integrity of the trial process. These persons face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel. *Id.*, at 320–321. This is not to say that under current law persons with intellectual disability who "meet the law's requirements for criminal responsibility" may not be tried and punished. *Id.,* at 306. They may not, however, receive the law's most severe sentence. *Id.,* at 318.

The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of *Atkins*. To determine if Florida's cutoff rule is valid, it is proper to consider the psychiatric and professional studies that elaborate on the purpose and meaning of IQ scores to determine how the scores relate to the holding of *Atkins*. This in turn leads to a better understanding of how the legislative policies of various States, and the holdings of state courts, implement the *Atkins* rule. That understanding informs our determination whether there is a consensus that instructs how to decide the specific issue presented here. And, in conclusion, this Court must express its own independent determination reached in light of the instruction found in those sources and authorities.

## III

### A

That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those

professionals use their learning and skills to study and
consider the consequences of the classification schemes
they devise in the diagnosis of persons with mental or
psychiatric disorders or disabilities. Society relies upon
medical and professional expertise to define and explain
how to diagnose the mental condition at issue. And the
definition of intellectual disability by skilled professionals
has implications far beyond the confines of the death
penalty: for it is relevant to education, access to social
programs, and medical treatment plans. In determining
who qualifies as intellectually disabled, it is proper to
consult the medical community's opinions.

As the Court noted in *Atkins*, the medical community
defines intellectual disability according to three criteria:
significantly subaverage intellectual functioning, deficits
in adaptive functioning (the inability to learn basic skills
and adjust behavior to changing circumstances), and onset
of these deficits during the developmental period. See *id.*,
at 308, n. 3; DSM–5, at 33; Brief for American Psychologi-
cal Association et al. as *Amici Curiae* 12–13 (hereinafter
APA Brief). This last factor, referred to as "age of onset,"
is not at issue.

The first and second criteria—deficits in intellectual
functioning and deficits in adaptive functioning—are
central here. In the context of a formal assessment, "[t]he
existence of concurrent deficits in intellectual and adap-
tive functioning has long been the defining characteristic
of intellectual disability." *Id.,* at 11.

On its face, the Florida statute could be consistent with
the views of the medical community noted and discussed
in *Atkins*. Florida's statute defines intellectual disability
for purposes of an *Atkins* proceeding as "significantly
subaverage general intellectual functioning existing con-
currently with deficits in adaptive behavior and manifested
during the period from conception to age 18." Fla. Stat.
§921.137(1) (2013). The statute further defines "signifi-

cantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." *Ibid.* The mean IQ test score is 100. The concept of standard deviation describes how scores are dispersed in a population. Standard deviation is distinct from standard error of measurement, a concept which describes the reliability of a test and is discussed further below. The standard deviation on an IQ test is approximately 15 points, and so two standard deviations is approximately 30 points. Thus a test taker who performs "two or more standard deviations from the mean" will score approximately 30 points below the mean on an IQ test, *i.e.*, a score of approximately 70 points.

On its face this statute could be interpreted consistently with *Atkins* and with the conclusions this Court reaches in the instant case. Nothing in the statute precludes Florida from taking into account the IQ test's standard error of measurement, and as discussed below there is evidence that Florida's Legislature intended to include the measurement error in the calculation. But the Florida Supreme Court has interpreted the provisions more narrowly. It has held that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited. See *Cherry* v. *State*, 959 So. 2d 702, 712–713 (Fla. 2007) (*per curiam*). That strict IQ test score cutoff of 70 is the issue in this case.

Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is

so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70. See APA Brief 15–16 ("[T]he relevant clinical authorities all agree that an individual with an IQ score above 70 may properly be diagnosed with intellectual disability if significant limitations in adaptive functioning also exist"); DSM–5, at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score").

Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.

The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. See D. Wechsler, The Measurement of Adult Intelligence 133 (3d ed. 1944) (reporting the range of error on an early IQ test). Each IQ test has a "standard error of measurement," *ibid.*, often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in measurement theory"). An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. See American Association on Intellectual and Develop-

mental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual); A. Kaufman, IQ Testing 101, pp. 138–139 (2009).

The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence level that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM–5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75 (70 ± 5)"); APA Brief 23 ("For example, the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Stanford-Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error)"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. See Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289–291, 318 (D. Saklofske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed,

or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

Despite these professional explanations, Florida law used the test score as a fixed number, thus barring further consideration of other evidence bearing on the question of intellectual disability. For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual's IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning. These include evidence of past performance, environment, and upbringing.

### B

A significant majority of States implement the protections of *Atkins* by taking the SEM into account, thus acknowledging the error inherent in using a test score without necessary adjustment. This calculation provides "objective indicia of society's standards" in the context of the Eighth Amendment. *Roper*, 543 U. S., at 563. Only the Kentucky and Virginia Legislatures have adopted a fixed score cutoff identical to Florida's. Ky. Rev. Stat. Ann. §532.130(2) (Lexis Supp. 2013); *Bowling* v. *Commonwealth*, 163 S. W. 3d 361, 375 (Ky. 2005); Va. Code Ann. §19.2–264.3:1.1 (Lexis Supp. 2013); *Johnson* v. *Commonwealth*, 267 Va. 53, 75, 591 S. E. 2d 47, 59 (2004), vacated and remanded on other grounds, 544 U. S. 901 (2005). Alabama also may use a strict IQ score cutoff at 70, although not as a result of legislative action. See *Smith* v. *State*, 71 So. 3d 12, 20 (Ala. Crim. App. 2008) ("The Alabama Supreme Court . . . did not adopt any 'margin of error' when examining a defendant's IQ score"). Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater, Tr. of Oral Arg. 9, and

so they are not included alongside Florida in this analysis.

In addition to these States, Arizona, Delaware, Kansas, North Carolina, and Washington have statutes which could be interpreted to provide a bright-line cutoff leading to the same result that Florida mandates in its cases. See Ariz. Rev. Stat. Ann. §13–753(F) (West 2013); Del. Code Ann. Tit. 11, §4209(d)(3) (2012 Supp.); Kan. Stat. Ann. §76–12b01 (2013 Supp.); N. C. Gen. Stat. Ann. §15A–2005 (Lexis 2013); Wash. Rev. Code §10.95.030(2)(c) (2012). That these state laws might be interpreted to require a bright-line cutoff does not mean that they will be so interpreted, however. See, *e.g.*, *State* v. *Vela*, 279 Neb. 94, 126, 137, 777 N. W. 2d 266, 292, 299 (2010) (Although Nebraska's statute specifies "[a]n intelligence quotient of seventy or below on a reliably administered intelligence quotient test," "[t]he district court found that [the defendant's] score of 75 on the [IQ test], considered in light of the standard error of measurement, could be considered as subaverage general intellectual functioning for purposes of diagnosing mental retardation").

Arizona's statute appears to set a broad statutory cutoff at 70, Ariz. Rev. Stat. Ann. §13–753(F) (West 2013), but another provision instructs courts to "take into account the margin of error for a test administered." *Id.* at §14-753(K)(5). How courts are meant to interpret the statute in a situation like Hall's is not altogether clear. The principal Arizona case on the matter, *State* v. *Roque*, 141 P. 3d 368, (Ariz 2006), states that "the statute accounts for margin of error by requiring multiple tests," and that "if the defendant achieves a full-scale score of 70 or below on any one of the tests, then the court proceeds to a hearing." *Id.* at 403. But that case also notes that the defendant had an IQ score of 80, well outside the margin of error, and that all but one of the sub-parts of the IQ test were "above 75." *Id.*

Kansas has not had an execution in almost five decades,

and so its laws and jurisprudence on this issue are unlikely to receive attention on this specific question. See *Atkins*, 536 U. S., at 316 ("[E]ven in those States that allow the execution of mentally retarded offenders, the practice is uncommon. Some States . . . continue to authorize executions, but none have been carried out in decades. Thus there is little need to pursue legislation barring the execution of the mentally retarded in those States"). Delaware has executed three individuals in the past decade, while Washington has executed one person, and has recently suspended its death penalty. None of the four individuals executed recently in those States appears to have brought a claim similar to that advanced here.

Thus, at most nine States mandate a strict IQ score cutoff at 70. Of these, four States (Delaware, Kansas, North Carolina, and Washington) appear not to have considered the issue in their courts. On the other side of the ledger stand the 18 States that have abolished the death penalty, either in full or for new offenses, and Oregon, which has suspended the death penalty and executed only two individuals in the past 40 years. See *Roper,* 543 U. S., at 574 ("[The] Court should have considered those States that had abandoned the death penalty altogether as part of the consensus against the juvenile death penalty"). In those States, of course, a person in Hall's position could not be executed even without a finding of intellectual disability. Thus in 41 States an individual in Hall's position—an individual with an IQ score of 71—would not be deemed automatically eligible for the death penalty.

These aggregate numbers are not the only considerations bearing on a determination of consensus. Consistency of the direction of change is also relevant. See *id.,* at 565–566 (quoting *Atkins*, *supra*, at 315). Since *Atkins*, many States have passed legislation to comply with the constitutional requirement that persons with intellectual disability not be executed. Two of these States, Virginia

and Delaware, appear to set a strict cutoff at 70, although as discussed, Delaware's courts have yet to interpret the law. In contrast, at least 11 States have either abolished the death penalty or passed legislation allowing defendants to present additional evidence of intellectual disability when their IQ test score is above 70.

Since *Atkins*, five States have abolished the death penalty through legislation. See 2012 Conn. Pub. Acts no. 12–5; Ill. Comp. Stat. ch. 725, §119–1 (West 2012); Md. Correc. Servs. Code Ann. §3–901 *et seq.* (Lexis 2008); N. J. Stat. Ann. §2C:11–3(b)(1) (West Supp. 2013); 2009 N. M. Laws ch. 11, §§5–7. In addition, the New York Court of Appeals invalidated New York's death penalty under the State Constitution in 2004, see *People* v. *LeValle*, 3 N. Y. 3d 88, 817 N. E. 2d 341 (2004), and legislation has not been passed to reinstate it. And when it did impose the death penalty, New York did not employ an IQ cutoff in determining intellectual disability. N. Y. Crim. Proc. Law Ann. §400.27(12)(e) (West 2005).

In addition to these States, at least five others have passed legislation allowing a defendant to present additional evidence of intellectual disability even when an IQ test score is above 70. See Cal. Penal Code Ann. §1376 (West Supp. 2014) (no IQ cutoff); Idaho Code §19–2515A (Lexis Supp. 2013) ("seventy (70) or below"); *Pizzutto* v. *State*, 146 Idaho 720, 729, 202 P. 3d 642, 651 (2008) ("The alleged error in IQ testing is plus or minus five points. The district court was entitled to draw reasonable inferences from the undisputed facts"); La. Code Crim. Proc. Ann., Art. 905.5.1 (West Supp. 2014) (no IQ cutoff); Nev. Rev. Stat. §174.098.7 (2013) (no IQ cutoff); Utah Code Ann §77–15a–102 (Lexis 2012) (no IQ cutoff). The U. S. Code likewise does not set a strict IQ cutoff. See 18 U. S. C. §3596(c). And no State that previously allowed defendants with an IQ score over 70 to present additional evidence of intellectual disability has modified its law to create a

strict cutoff at 70.  Cf. *Roper*, *supra*, at 566 ("Since *Stanford* v. *Kentucky*, 492 U. S. 361 (1989), no State that previously prohibited capital punishment for juveniles has reinstated it").

In summary, every state legislature to have considered the issue after *Atkins*—save Virginia's—and whose law has been interpreted by its courts has taken a position contrary to that of Florida.  Indeed, the Florida Legislature, which passed the relevant legislation prior to *Atkins*, might well have believed that its law would not create a fixed cutoff at 70.  The staff analysis accompanying the 2001 bill states that it "does not contain a set IQ level . . . .  Two standard deviations from these tests is approximately a 70 IQ, although it can be extended up to 75."  Fla. Senate Staff Analysis and Economic Impact Statement, CS/SB 238, p. 11 (Feb. 14, 2001).  But the Florida Supreme Court interpreted the law to require a bright-line cutoff at 70, see *Cherry*, 959 So. 2d, at 712–713, and the Court is bound by that interpretation.

The rejection of the strict 70 cutoff in the vast majority of States and the "consistency in the trend," *Roper*, *supra*, at 567, toward recognizing the SEM provide strong evidence of consensus that our society does not regard this strict cutoff as proper or humane.

C

*Atkins* itself acknowledges the inherent error in IQ testing.  It is true that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation" falls within the protection of the Eighth Amendment.  *Bobby* v. *Bies*, 556 U. S. 825, 831 (2009).  In *Atkins,* the Court stated:

"Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.  As was our approach in *Ford* v. *Wain-*

*wright* with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" 536 U. S., at 317 (quoting *Ford* v. *Wainwright*, 477 U. S. 399, 416–417 (1986); citation omitted).

As discussed above, the States play a critical role in advancing protections and providing the Court with information that contributes to an understanding of how intellectual disability should be measured and assessed. But *Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection.

The *Atkins* Court twice cited definitions of intellectual disability which, by their express terms, rejected a strict IQ test score cutoff at 70. *Atkins* first cited the definition provided in the DSM–IV: "'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70." 536 U. S., at 308, n. 3 (citing Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000)). The Court later noted that "'an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.'" 536 U. S., at 309, n. 5. Furthermore, immediately after the Court declared that it left "'to the States the task of developing appropriate ways to enforce the constitutional restriction,'" *id.,* at 317, the Court stated in an accompanying footnote that "[t]he [state] statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions," *ibid.*

Thus *Atkins* itself not only cited clinical definitions for intellectual disability but also noted that the States' standards, on which the Court based its own conclusion, conformed to those definitions. In the words of *Atkins,* those persons who meet the "clinical definitions" of intel-

lectual disability "by definition . . . have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.*, at 318. Thus, they bear "diminish[ed] . . . personal culpability." *Ibid.* The clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of *Atkins.* And those clinical definitions have long included the SEM. See Diagnostic and Statistical Manual of Mental Disorders 28 (rev. 3d ed. 1987) ("Since any measurement is fallible, an IQ score is generally thought to involve an error of measurement of approximately five points; hence, an IQ of 70 is considered to represent a band or zone of 65 to 75. Treating the IQ with some flexibility permits inclusion in the Mental Retardation category of people with IQs somewhat higher than 70 who exhibit significant deficits in adaptive behavior").

Respondent argues that the current Florida law was favorably cited by the *Atkins* Court. See Brief for Respondent 18 ("As evidence of the national consensus, the Court specifically cited Florida's statute at issue here, which has not substantively changed"). While *Atkins* did refer to Florida's law in a citation listing States which had outlawed the execution of the intellectually disabled, 536 U. S., at 315, that fleeting mention did not signal the Court's approval of Florida's current understanding of the law. As discussed above, when *Atkins* was decided the Florida Supreme Court had not yet interpreted the law to require a strict IQ cutoff at 70. That new interpretation runs counter to the clinical definition cited throughout *Atkins* and to Florida's own legislative report indicating this kind of cutoff need not be used.

Respondent's argument also conflicts with the logic of *Atkins* and the Eighth Amendment. If the States were to

have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. This Court thus reads *Atkins* to provide substantial guidance on the definition of intellectual disability.

D

The actions of the States and the precedents of this Court "give us essential instruction," *Roper*, 543 U. S., at 564, but the inquiry must go further. "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Coker* v. *Georgia*, 433 U. S. 584, 597 (1977) (plurality opinion). That exercise of independent judgment is the Court's judicial duty. See *Roper*, *supra,* at 574 ("[T]o the extent *Stanford* was based on a rejection of the idea that this Court is required to bring its independent judgment to bear on the proportionality of the death penalty for a particular class of crimes or offenders, it suffices to note that this rejection was inconsistent with prior Eighth Amendment decisions" (citation omitted).

In this Court's independent judgment, the Florida statute, as interpreted by its courts, is unconstitutional.

In addition to the views of the States and the Court's precedent, this determination is informed by the views of medical experts. These views do not dictate the Court's decision, yet the Court does not disregard these informed assessments. See *Kansas* v. *Crane*, 534 U. S. 407, 413 (2002) ("[T]he science of psychiatry . . . informs but does not control ultimate legal determinations . . ."). It is the Court's duty to interpret the Constitution, but it need not do so in isolation. The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic frame-

work. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n. 5, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

The flaws in Florida's law are the result of the inherent error in IQ tests themselves. An IQ score is an approximation, not a final and infallible assessment of intellectual functioning. See APA Brief 24 ("[I]t is standard pyschometric practice to report the 'estimates of relevant reliabilities and standard errors of measurement' when reporting a test score"); *ibid.* (the margin of error is "inherent to the accuracy of IQ scores"); Furr, Psychometrics, at 119 ("[T]he standard error of measurement is an important psychometric value with implications for applied measurement"). SEM is not a concept peculiar to the psychiatric profession and IQ tests. It is a measure that is recognized and relied upon by those who create and devise tests of all sorts. *Id.,* at 118 (identifying the SEM as "one of the most important concepts in measurement theory").

This awareness of the IQ test's limits is of particular

importance when conducting the conjunctive assessment necessary to assess an individual's intellectual ability. See American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports 40 (11th ed. 2010) ("It must be stressed that the diagnosis of [intellectual disability] is intended to reflect a clinical judgment rather than an actuarial determination").

Intellectual disability is a condition, not a number. See DSM–5, at 37. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability. See APA Brief 17 ("Under the universally accepted clinical standards for diagnosing intellectual disability, the court's determination that Mr. Hall is not intellectually disabled cannot be considered valid").

This Court agrees with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.

It is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment. See DSM–5, at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score"). The Florida statute, as interpreted by its courts, misuses IQ score on its own terms; and

this, in turn, bars consideration of evidence that must be considered in determining whether a defendant in a capital case has intellectual disability. Florida's rule is invalid under the Constitution's Cruel and Unusual Punishments Clause.

## E

Florida seeks to execute a man because he scored a 71 instead of 70 on an IQ test. Florida is one of just a few States to have this rigid rule. Florida's rule misconstrues the Court's statements in *Atkins* that intellectually disability is characterized by an IQ of "approximately 70." 536 U. S., at 308, n. 3. Florida's rule is in direct opposition to the views of those who design, administer, and interpret the IQ test. By failing to take into account the standard error of measurement, Florida's law not only contradicts the test's own design but also bars an essential part of a sentencing court's inquiry into adaptive functioning. Freddie Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime.

The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

The judgment of the Florida Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–10882

_____

## FREDDIE LEE HALL, PETITIONER *v.* FLORIDA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
FLORIDA

[May 27, 2014]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

In *Atkins* v. *Virginia*, 536 U. S. 304 (2002), the Court held that the Eighth Amendment prohibits a death sentence for defendants who are intellectually disabled but does not mandate the use of a single method for identifying such defendants. Today, the Court overrules the latter holding based largely on the positions adopted by private professional associations. In taking this step, the Court sharply departs from the framework prescribed in prior Eighth Amendment cases and adopts a uniform national rule that is both conceptually unsound and likely to result in confusion. I therefore respectfully dissent.

I

The Court's approach in this case marks a new and most unwise turn in our Eighth Amendment case law. In *Atkins* and other cases, the Court held that the prohibition of cruel and unusual punishment embodies the "evolving standards of decency that mark the progress of a maturing society," and the Court explained that "those evolving standards should be informed by objective factors to the maximum possible extent." *Id.,* at 312 (internal quotation marks omitted). In addition, the Court "pinpointed that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the coun-

try's legislatures." *Ibid.*

In these prior cases, when the Court referred to the evolving standards of a maturing "society," the Court meant the standards of *American society as a whole.* Now, however, the Court strikes down a state law based on the evolving standards of *professional societies*, most notably the American Psychiatric Association (APA). The Court begins its analysis with the views of those associations, see *ante*, at 7–12, and then, after briefly discussing the enactments of state legislatures, see *ante*, at 12–16, returns to the associations' views in interpreting *Atkins* and in exercising the Court's "independent judgment" on the constitutionality of Florida's law, see *ante*, at 16–22. This approach cannot be reconciled with the framework prescribed by our Eighth Amendment cases.

A

Under this Court's modern Eighth Amendment precedents, whether a punishment is "cruel and unusual" depends on currently prevailing societal norms, and the Court has long held that laws enacted by state legislatures provide the "clearest and most reliable objective evidence of contemporary values," *Penry* v. *Lynaugh*, 492 U. S. 302, 331 (1989). This is so because "in a democratic society[,] legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people," *Gregg* v. *Georgia*, 428 U. S. 153, 175–176 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (internal quotation marks omitted). Under this approach, as originally conceived, the Court first asked whether a challenged practice contravened a clear national consensus evidenced by state legislation, and only if such a consensus was found would the Court go on and ask "whether there is reason to disagree with [the States'] judgment." *Atkins*, 536 U. S., at 313.

Invoking this two-step procedure, *Atkins* held that the

Eighth Amendment forbids the execution of defendants who are intellectually disabled. See *id.*, at 315–316. Critical to the Court's analysis was the conclusion that "today our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.*, at 316. "This consensus," the Court continued, "unquestionably reflects widespread judgment about . . . the relationship between mental retardation and the penological purposes served by the death penalty." *Id.*, at 317.

While *Atkins* identified a consensus against the execution of the intellectually disabled, the Court observed that there was "serious disagreement" among the States with respect to the best method for "determining which offenders are in fact retarded." *Ibid.* The Court therefore "le[ft] to the States the task of developing appropriate ways" to identify these defendants. *Ibid.* (internal quotation marks and alteration omitted). As we noted just five years ago, *Atkins* "did not provide definitive procedural or substantive guides for determining when a person" is intellectually disabled. *Bobby* v. *Bies*, 556 U. S. 825, 831 (2009).

B

Consistent with the role that *Atkins* left for the States, Florida follows the procedure now at issue. As we explained in *Atkins*, in order for a defendant to qualify as intellectually disabled, three separate requirements must be met: It must be shown that a defendant has both (1) significantly subaverage intellectual functioning and (2) deficits in adaptive behavior, and that (3) the onset of both factors occurred before the age of 18. See 536 U. S., at 318; *ante*, at 8. In implementing this framework, Florida has determined that the first requirement cannot be satisfied if the defendant scores higher than 70 on IQ tests, the long-accepted method of measuring intellectual

functioning.[1]   The Court today holds that this scheme
offends the Eighth Amendment.  The Court objects that
Florida's approach treats IQ test scores as conclusive and
ignores the fact that an IQ score might not reflect "true"
IQ because of errors in measurement.  The Court then
concludes that a State must view a defendant's IQ as a
range of potential scores calculated using a statistical
concept known as the "standard error of measurement" or
SEM.  See Part II–B–1, *infra*.  The Court holds that if this
range includes an IQ of 70 or below (the accepted level for
intellectual disability), the defendant must be permitted to
produce other evidence of intellectual disability in addition
to IQ scores.

I see no support for this holding in our traditional ap-
proach for identifying our society's evolving standards of
decency.  Under any fair analysis of current state laws,
the same absence of a consensus that this Court found in
*Atkins* persists today.  It is telling that Hall himself does
not rely on a consensus among States.  He candidly argues
instead that "the precise number of States that share
Florida's approach is immaterial."  Reply Brief 2.

The Court's analysis is more aggressive.  According to
the Court, a "significant majority of States" reject Florida's
"strict 70 cutoff" and instead take "the SEM into account"
when deciding whether a defendant meets the first re-
quirement of the intellectual-disability test.  *Ante*, at 12,
16.  On the Court's count, "at most nine States mandate a
strict IQ score cutoff at 70"; 22 States allow defendants to
present "additional evidence" when an individual's test

--------

[1] See, *e.g.*, American Association of Intellectual and Developmental
Disabilities (AAIDD), Intellectual Disability 10–11 (11th ed. 2010)
(hereinafter AAIDD 11th ed.) (cataloguing history of IQ "cutoff criteria"
since 1959).  Earlier publications of the AAIDD were published under
its former name, the American Association on Mental Retardation
(hereinafter AAMR).

score is between 70 and 75, *ante*, at 20;[2] and 19 States have abolished the death penalty or have long suspended its operation. *Ante*, at 14. From these numbers, the Court concludes that "in 41 States" a defendant "with an IQ score of 71" would "not be deemed automatically eligible for the death penalty." *Ibid.*[3] This analysis is deeply flawed.

To begin, in addition to the 8 other States that the Court recognizes as having rules similar to Florida's, 1 more, Idaho, does not appear to require courts to take the SEM into account in rejecting a claim of intellectual disability.[4] And of the remaining 21 States with the death penalty, 9 have either said nothing about the SEM or have not clarified whether they require its use.[5] Accordingly, of the

———————

[2] I assume that by "additional evidence" the Court means evidence other than further IQ testing because Florida's rule already "allows for multiple evaluations, and . . . [petitioner] could have sought still more testing." Brief for Respondent 44. See also Brief for Petitioner 50; App. 107–108.

[3] As I discuss below, the Florida Supreme Court did not base its decision on a finding that Hall's IQ was 71. The Florida courts considered several IQ scores, all above 70. See App. 107–108; Brief for Petitioner 50.

[4] See Idaho Code §19–2515A(1)(b) (Lexis Cum. Supp. 2013); *Pizzuto* v. *State*, 146 Idaho 720, 729, 202 P. 3d 642, 651 (2008) (stating that "the legislature did not require that the IQ score be within five points of 70 or below" and giving the District Court discretion to interpret the defendant's IQ).

[5] Montana, New Hampshire, and Wyoming have not ruled on the subject. Two States have not defined "significantly subaverage" intellectual functioning. See Colo. Rev. Stat. Ann. §18–1.3–1101(2) (2013); S. C. Code Ann. §16–3–20 (2003 and 2013 Cum. Supp.); *Franklin* v. *Maynard*, 356 S. C. 276, 278–279, 588 S. E. 2d 604, 605 (2003) (*per curiam*). Two States have statutes that impose rebuttable presumptions of intellectual disability if a defendant's IQ is below 65 or 70 but have not said whether a defendant would be allowed to provide further evidence if his IQ were over 70. See Ark. Code Ann. §5–4–618 (2013); Neb. Rev. Stat. §28–105.01 (2013 Supp.). One State's Supreme Court mentioned measurement errors but only to explain why a defendant

death-penalty states, 10 (including Florida) do not require that the SEM be taken into account, 12 consider the SEM, and 9 have not taken a definitive position on this question. These statistics cannot be regarded as establishing a national consensus against Florida's approach.

Attempting to circumvent these statistics, the Court includes in its count the 19 States that never impose the death penalty, but this maneuver cannot be justified. It is true that the Court has counted non-death-penalty States in some prior Eighth Amendment cases, but those cases concerned the substantive question whether a class of individuals should be categorically ineligible for the death penalty. In *Roper* v. *Simmons*, 543 U. S. 551 (2005), for example, the Court counted non-death-penalty States as part of the consensus against the imposition of a capital sentence for a crime committed by a minor. *Id.,* at 574. The Court reasoned that a State's decision to abolish the death penalty necessarily "demonstrates a judgment that the death penalty is inappropriate for all offenders, including juveniles." *Ibid.*

No similar reasoning is possible here. The fact that a State has abolished the death penalty says nothing about how that State would resolve the evidentiary problem of identifying defendants who are intellectually disabled. As I explain below, a State may reasonably conclude that Florida's approach is fairer than and just as accurate as the approach that the Court now requires, and therefore it cannot be inferred that a non-death-penalty State, if forced to choose between the two approaches, would necessarily select the Court's. For all these reasons, it is quite

_____

must prove deficits in adaptive behavior despite having an IQ below 70. See *Stripling* v. *State*, 261 Ga. 1, 3, 401 S. E. 2d 500, 504 (1991). Another State's Supreme Court mentioned the SEM in responding to an argument by the defendant, but it did not suggest that the SEM was legally relevant. See *Goodwin* v. *State*, 191 S. W. 3d 20, 30–31, and n. 7 (Mo. 2006).

wrong for the Court to proclaim that "the vast majority of States" have rejected Florida's approach. *Ante*, at 16.

Not only are the States divided on the question whether the SEM should play a role in determining whether a capital defendant is intellectually disabled, but the States that require consideration of the SEM do not agree on the role that the SEM should play. Those States differ, for example, on the sort of evidence that can be introduced when IQ testing reveals an IQ over 70. Some require further evidence of *intellectual* deficits, while others permit the defendant to move on to the second prong of the test and submit evidence of deficits in *adaptive* behavior.[6] The fairest assessment of the current situation is that the States have adopted a multitude of approaches to a very difficult question.

In light of all this, the resolution of this case should be straightforward: Just as there was no methodological consensus among the States at the time of *Atkins*, there is no such consensus today. And in the absence of such a consensus, we have no basis for holding that Florida's method contravenes our society's standards of decency.

## C

Perhaps because it recognizes the weakness of its arguments about a true national consensus, the Court places heavy reliance on the views (some only recently announced) of professional organizations, but the Court attempts to downplay the degree to which its decision is dependent upon the views of these private groups. In a game attempt to shoehorn the views of these associations into the national-consensus calculus, the Court reasons as follows. The views of these associations, the Court states, help in determining "how [IQ] scores relate to the holding

————————
[6] Compare *Ybarra* v. *State*, 127 Nev. \_\_\_, \_\_\_, 247 P. 3d 269, 274 (2011), with *State* v. *Dunn*, 2001–1635, pp. 25–26 (La. 5/11/10), 41 So. 3d 454, 470.

in *Atkins"*; "[t]his in turn leads to a better understanding of how the legislative policies of various States, and the holdings of state courts, implement the *Atkins* rule"; and "[t]hat understanding informs our determination whether there is a consensus that instructs how to decide the specific issue presented here." *Ante*, at 7.

I cannot follow the Court's logic. Under our modern Eighth Amendment cases, what counts are our society's standards—which is to say, the standards of the American people—not the standards of professional associations, which at best represent the views of a small professional elite.

The Court also mistakenly suggests that its methodology is dictated by *Atkins.* See *ante*, at 16–19. On the contrary, *Atkins* expressly left "to the States" the task of defining intellectual disability. And although the *Atkins* Court perceived a "professional consensus" about the best procedure to be used in identifying the intellectually disabled, the *Atkins* Court declined to import that view into the law. 536 U. S., at 316, n. 21. Instead, the Court made clear that this professional consensus was "by no means dispositive." *Id.,* at 317, n. 21; see *id.*, at 317, and n. 22.

D

The Court's reliance on the views of professional associations will also lead to serious practical problems. I will briefly note a few.

First, because the views of professional associations often change,[7] tying Eighth Amendment law to these views will lead to instability and continue to fuel protracted litigation. This danger is dramatically illustrated by the most recent publication of the APA, on which the Court relies. This publication fundamentally alters the

_____

[7] See Forensic Psychology and Neuropsychology for Criminal and Civil Cases 57 (H. Hall ed. 2008) (hereinafter Forensic Psychology).

first prong of the longstanding, two-pronged definition of intellectual disability that was embraced by *Atkins* and has been adopted by most States. In this new publication, the APA discards "significantly subaverage intellectual functioning" as an element of the intellectual-disability test.[8] Elevating the APA's current views to constitutional significance therefore throws into question the basic approach that *Atkins* approved and that most of the States have followed.

It is also noteworthy that changes adopted by professional associations are sometimes rescinded. For example, in 1992 the AAIDD extended the baseline "intellectual functioning cutoff" from an "IQ of 70 or below" to a "score of approximately 70 to 75 or below." AAIDD 11th ed. 10 (Table 1.3) (boldface deleted); see 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 3449 (B. Sadock, V. Sadock, & P. Ruiz eds., 9th ed. 2009) (hereinafter Kaplan & Sadock's). That change "generated much controversy"; by 2000, "only 4 states used the 1992 AAIDD definition, with 44 states continuing to use the 1983 definition." *Ibid.* And in the 2002 AAIDD, the baseline "IQ cut-off was changed" back to approximately "70 or less." *Ibid.*

Second, the Court's approach implicitly calls upon the Judiciary either to follow every new change in the thinking of these professional organizations or to judge the validity of each new change. Here, for example, the Court tacitly makes the judgment that the diagnostic criteria for intellectual disability that prevailed at the time when *Atkins* was decided are no longer legitimate. The publications that *Atkins* cited differ markedly from more recent

—————

[8] Compare APA, Diagnostic and Statistical Manual of Mental Disorders 39, 41, 42 (rev. 4th ed. 2000) (hereinafter DSM–IV–TR), with APA, Diagnostic and Statistical Manual of Mental Disorders 33, 809 (5th ed. 2013) (hereinafter DSM–5).

editions now endorsed by the Court. See 536 U. S., at 308, n. 3.

Third, the Court's approach requires the Judiciary to determine which professional organizations are entitled to special deference. And what if professional organizations disagree? The Court provides no guidance for deciding which organizations' views should govern.

Fourth, the Court binds Eighth Amendment law to definitions of intellectual disability that are promulgated for use in making a variety of decisions that are quite different from the decision whether the imposition of a death sentence in a particular case would serve a valid penological end. In a death-penalty case, intellectual functioning is important because of its correlation with the ability to understand the gravity of the crime and the purpose of the penalty, as well as the ability to resist a momentary impulse or the influence of others. See *id.*, at 318, 320. By contrast, in determining eligibility for social services, adaptive functioning may be much more important. Cf. DSM–IV–TR, at xxxvii (clinical "considerations" may not be "relevant to legal judgments" that turn on "individual responsibility"); DSM–5, at 20 (similar). Practical problems like these call for legislative judgments, not judicial resolution.

## II

Because I find no consensus among the States, I would not independently assess the method that Florida has adopted for determining intellectual disability. But even if it were appropriate for us to look beyond the evidence of societal standards, I could not conclude that Florida's method is unconstitutional. The Court faults Florida for "tak[ing] an IQ score as final and conclusive evidence of a defendant's intellectual capacity" and for failing to recognize that an IQ score may be imprecise. *Ante*, at 10. In my view, however, Florida has adopted a sensible stand-

ard that comports with the longstanding belief that IQ tests are the best measure of intellectual functioning. And although the Court entirely ignores this part of the Florida scheme, the State takes into account the inevitable risk of testing error by permitting defendants to introduce multiple scores.

In contrast, the Court establishes a standard that conflates what have long been understood to be two *independent* requirements for proving intellectual disability: (1) significantly subaverage intellectual functioning and (2) deficits in adaptive behavior. The Court also mandates use of an alternative method of dealing with the risk of testing error without any hint that it is more accurate than Florida's approach.

### A

### 1

The first supposed error that the Court identifies is that Florida "takes an IQ score" as "conclusive evidence" of intellectual functioning. *Ante*, at 10. As an initial matter, one would get the impression from reading the Court's opinion that Hall introduced only one test score (of 71). See *ante*, at 14. In truth, the Florida courts considered multiple scores, all above 70, on the particular IQ test that Hall has dubbed the "gold standard." See Brief for Petitioner 50; App. 107–108.[9] Florida's statute imposes no limit on the number of IQ scores that a defendant may introduce, so the Court is simply wrong to analyze the Florida system as one that views a *single* IQ score above 70 as "final and conclusive evidence" that a defendant does not suffer from subaverage intellectual functioning. See

---

[9] See Brief for Petitioner 50 (listing his valid IQ scores of 71, 72, 73, and 80). Hall alleges that he also scored a 69 on a Wechsler test, but that score was not admitted into evidence because of doubts about its validity. App. 107. Hall does not allege that any potential "practice effect" skewed his scores.

Brief for Respondent 44 ("Florida's Rule allows for multiple evaluations, and if Hall believed a statistical error rate prevented any of his tests from reflecting his true score, he could have sought still more testing").

The proper question to ask, therefore, is whether Florida's actual approach falls outside the range of discretion allowed by *Atkins.* The Court offers no persuasive reason for concluding that it does. Indeed, the Court's opinion never identifies what other evidence of intellectual functioning it would require Florida to admit. As we recognized in *Atkins,* the longstanding practices of the States, and at least the previous views of professional organizations, seem to reflect the understanding that IQ scores are the best way to measure intellectual functioning. See 536 U. S., at 316.[10] Until its most recent publication, the APA, for example, ranked the severity of intellectual disability exclusively by IQ scores, necessarily pinpointing the onset of the disability according to IQ. See DSM–IV–TR, at 42.

We have been presented with no solid evidence that the longstanding reliance on multiple IQ test scores as a measure of intellectual functioning is so unreasonable or outside the ordinary as to be unconstitutional. The Court has certainly not supplied any such information.

2

If the Court had merely held that Florida must permit defendants to introduce additional evidence (whatever that might be) of significantly subaverage intellectual

—————

[10] See AAIDD 11th ed. 10 (cataloguing history of IQ "cutoff criteria" since 1959); DSM–IV–TR, at 39 ("Mental Retardation" is "characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) . . ." (boldface deleted)); *id.,* at 41 ("General intellectual functioning is defined by the intelligence quotient . . ." (italics deleted)); AAMR, Mental Retardation 14 (10th ed. 2002) (hereinafter AAMR 10th ed.) ("[I]ntellectual functioning is still best represented by IQ scores . . .").

functioning, its decision would be more limited in scope. But as I understand the Court's opinion, it also holds that when IQ tests reveal an IQ between 71 and 75, defendants must be allowed to present evidence of deficits in *adaptive behavior*—that is, the *second* prong of the intellectual-disability test. See *ante*, at 9–10, 12, 20. That is a remarkable change in what we took to be a universal understanding of intellectual disability just 12 years ago.

In *Atkins*, we instructed that "clinical definitions of mental retardation require *not only* [(1)] subaverage intellectual functioning, *but also* [(2)] significant limitations in adaptive skills." 536 U. S., at 318 (emphasis and alterations added). That is the approach taken by the vast majority of States.[11] As the Court correctly recognizes, most States require "*concurrent* deficits" in intellectual functioning and adaptive behavior, requiring defendants to prove *both*. *Ante*, at 8 (emphasis added).[12]

Yet the Court now holds that when a defendant's IQ score is as high as 75, a court must "consider factors indicating whether the person has deficits in adaptive functioning." *Ante*, at 12; see *ante*, at 9–10, 20. In other words, even when a defendant has failed to show that he meets the first prong of the well-accepted standard for intellectual disability (significantly subaverage intellectual functioning), evidence of the second prong (deficits in adaptive behavior) can establish intellectual disability.

The Court offers little explanation for this sea change.

--------

[11] See, *e.g.*, Del. Code Ann., Tit. 11, §4209 (2007); Idaho Code §19–2515A; Nev. Rev. Stat. §174.098 (2013); Va. Code Ann. §19.2–264.3:1.1 (Lexis Cum. Supp. 2013).

[12] The longstanding views of professional organizations have also been that intellectual functioning and adaptive behavior are independent factors. See, *e.g.*, DSM–IV–TR, at 39. These organizations might recommend examining evidence of adaptive behavior even when an IQ is above 70, but that sheds no light on what the *legal* rule should be given that most States appear to require defendants to prove each prong separately by a preponderance of the evidence.

It asserts vaguely that "[i]t is not sound to view a single factor as dispositive of a conjunctive and interrelated assessment." *Ante*, at 21. But the Court ignores the fact that deficits in adaptive behavior cannot be used to establish deficits in mental functioning because the two prongs are meant to show distinct components of intellectual disability. "[I]ntellectual functions" include "reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience," while adaptive functioning refers to the ability "to meet developmental and sociocultural standards for personal independence and social responsibility." DSM–5, at 33. Strong evidence of a deficit in adaptive behavior does not necessarily demonstrate a deficit in intellectual functioning. And without the latter, a person simply cannot be classified as intellectually disabled.

It is particularly troubling to relax the proof requirements for the intellectual-functioning prong because that is the prong that most directly relates to the concerns that led to our primary holding in *Atkins*. There, we explained that "the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses"—*i.e.*, diminished *intellectual* functioning—"make it less likely that [a defendant] can process the information of the possibility of execution as a penalty" and therefore be deterred from committing murders. 536 U. S., at 320; see also *id.*, at 318 ("[T]hey often act on impulse rather than pursuant to a premeditated plan . . ."); see also *ante,* at 6. A defendant who does not display significantly subaverage intellectual functioning is therefore not among the class of defendants we identified in *Atkins*.

Finally, relying primarily on proof of adaptive deficits will produce inequities in the administration of capital punishment. As far as I can tell, adaptive behavior is a malleable factor without "firm theoretical and empirical

roots." See 2 Kaplan & Sadock's 3448. No consensus exists among States or medical practitioners about what facts are most critical in analyzing that factor, and its measurement relies largely on subjective judgments. Florida's approach avoids the disparities that reliance on such a factor tends to produce. It thus promotes consistency in the application of the death penalty and confidence that it is not being administered haphazardly.

## B

The Court's second "interrelated" objection to Florida's rule is that it fails to account for the risk of error inherent in IQ testing. In order to diminish this risk, the Court establishes a rule that if IQ testing reveals an IQ between 71 and 75, a claim of intellectual disability cannot be rejected on the basis of test scores alone. *Ante,* at 20. The Court both misunderstands how the SEM works and fails to explain why Florida's method of accounting for the risk of error (allowing a defendant to take and rely on multiple tests) is not as effective as the approach that the Court compels.

### 1

The Court begins with the simple and uncontroversial proposition that every testing situation is susceptible to error and thus may result in an imperfect measurement of "true" IQ. The Court then wades into technical matters that must be understood in order to see where the Court goes wrong.

There are various ways to account for error in IQ testing. One way is Florida's approach (evaluate multiple test results). Another is to use a mathematical measurement called the "standard error of measurement" or SEM. See AAMR 10th ed. 67–71 (App. 4.1). Of critical importance, there is not a single, uniform SEM across IQ tests or even across test-takers. Rather, "the [SEM] varies by test,

subgroup, and age group." User's Guide To Accompany AAIDD 11th ed.: Definition, Classification, and Systems of Supports 22 (2012).

Once we know the SEM for a particular test and a particular test-taker, adding *one* SEM to and subtracting *one* SEM from the obtained score establishes an interval of scores known as the 66% confidence interval. See AAMR 10th ed. 57. That interval represents the range of scores within which "we are [66%] sure" that the "true" IQ falls. See Oxford Handbook of Child Psychological Assessment 291 (D. Saklofske, C. Reynolds, & V. Schwean eds. 2013). The interval is centered on the obtained score, and it includes scores that are above and below that score by the amount of the SEM. Since there is about a 66% chance that the test-taker's "true" IQ falls within this range, there is about a 34% chance that the "true" IQ falls outside the interval, with approximately equal odds that it falls above the interval (17%) or below the interval (17%).

An example: If a test-taker scores a 72 on an IQ test with a SEM of 2, the 66% confidence interval is the range of 70 to 74 (72 ± 2). In this situation, there is approximately a 66% chance that the test-taker's "true" IQ is between 70 and 74; roughly a 17% chance that it is above 74; and roughly a 17% chance that it is 70 or below. Thus, there is about an 83% chance that the score is above 70.

Similarly, using *two* SEMs, we can build a 95% confidence interval. The process is the same except that we add two SEMs to and subtract two SEMS from the obtained score. To illustrate the use of two SEMs, let us hypothesize a case in which the defendant's obtained score is 74. With the same SEM of 2 as in the prior example, there would be a 95% chance that the true score is between 70 and 78 (74 ± 4); roughly a 2.5% chance that the score is above 78; and about a 2.5% chance that the score is 70 or below. The probability of a true score above 70 would be roughly 97.5%. As these two examples show, the

greater the degree of confidence demanded, the greater the range of scores that will fall within the confidence interval and, therefore, the further away from 70 an obtained score could be and yet still have 70 fall within its confidence interval.

2

The Court misunderstands these principles and makes factual mistakes that will surely confuse States attempting to comply with its opinion.

First, the Court unjustifiably assumes a blanket (or very common) error measurement of 5. See *ante*, at 20. That assumption gives rise to the Court's holding that a defendant must be permitted to introduce additional evidence when IQ tests reveal an IQ as high as 75. See *ibid.* SEMs, however, vary by IQ test and test-taker, and there is no reason to assume a SEM of 5 points; indeed, it appears that the SEM is generally "estimated to be three to five points" for well-standardized IQ tests. AAMR 10th ed. 57. And we know that the SEM for Hall's most recent IQ test was 2.16—less than half of the Court's estimate of 5. Brief for Petitioner 40, n. 17.

Relatedly, the Court misreads the authorities on which it relies to establish this cutoff IQ score of 75. It is true that certain professional organizations have advocated a cutoff of 75 and that *Atkins* cited those organizations' cutoff. See *ante,* at 12, 20. But the Court overlooks a critical fact: Those organizations endorsed a 75 IQ cutoff based on their express understanding that "*one* standard error of measurement [SEM]" is "three to five points for well-standardized" IQ tests. AAMR, Mental Retardation 37 (9th ed. 1992) (hereinafter AAMR 9th ed.); *Atkins*, 536 U. S., 309, n. 5 (citing AAMR 9th ed.; 2 Kaplan & Sadock's 2592 (B. Sadock & V. Sadock eds., 7th ed. 2000)); see also AAMR 10th ed. 57; AAIDD 11th ed. 36. In other words, the number 75 was relevant only to the extent that a

*single* SEM was "estimated" to be as high as 5 points. AAMR 9th ed. 37. Here, by contrast, we know that the SEM for Hall's latest IQ test was less than half of that estimate; there is no relevance to the number 75 in this case. To blindly import a five-point margin of error when we know as a matter of fact that the relevant SEM is 2.16 amounts to requiring consideration of more than *two* SEMs—an approach that finds no support in *Atkins* or anywhere else.

Because of these factual errors and ambiguities, it is unclear to me whether the Court concludes that a defendant is constitutionally entitled to introduce non-test evidence of intellectual disability (1) whenever his score is 75 or lower, on the mistaken understanding that the SEM for most tests is 5; (2) when the 66% confidence interval (using one SEM) includes a score of 70; or (3) when the 95% confidence interval (using two SEMs) includes a score of 70. In my view, none of these approaches is defensible.

An approach tied to a fixed score of 75 can be dismissed out of hand because, as discussed, every test has a different SEM.

The other two approaches would require that a defendant be permitted to submit additional evidence when his IQ is above 70 so long as the 66% or 95% confidence interval (using one SEM or two SEMs, respectively) includes a score of 70, but there is no foundation for this in our Eighth Amendment case law. As Hall concedes, the Eighth Amendment permits States to assign to a defendant the burden of establishing intellectual disability by at least a preponderance of the evidence. See Tr. of Oral Arg. 12. In other words, a defendant can be required to prove that the probability of a 70 or sub-70 IQ is greater than 50%. Under the Court's approach, by contrast, a defendant could prove significantly subaverage intellectual functioning by showing simply that the probability of a "true" IQ of 70 or below is as little as 17% (under a one-SEM

rule) or 2.5% (under a two-SEM rule). This totally transforms the allocation and nature of the burden of proof.

I have referred to the 66% and 95% confidence intervals only because they result from the most straightforward application of the SEM in this context: One SEM establishes the 66% confidence interval; two SEMs establish the 95% confidence interval. See AAIDD 11th ed. 36. But it would be simple enough to devise a 51% confidence interval—or a 99% confidence interval for that matter. There is therefore no excuse for mechanically imposing standards that are unhinged from legal logic and that override valid state laws establishing burdens of proof. The appropriate confidence level is ultimately a judgment best left to legislatures, and their judgment has been that a defendant must establish that it is more likely than not that he is intellectually disabled. I would defer to that determination.

### 3

The Court also fails to grasp that Florida's system already accounts for the risk of testing error by allowing the introduction of multiple test scores. The Court never explains why its criticisms of the uncertainty resulting from the use of a *single* IQ score apply when a defendant consistently scores above 70 on *multiple* tests. Contrary to the Court's evident assumption, the well-accepted view is that multiple consistent scores establish a much higher degree of confidence.[13]

––––––––––

[13] See Oxford Handbook of Child Psychological Assessment 291 (D. Saklofske, C. Reynolds, & V. Schwean eds. 2013) (multiple scores provide "greater precision"); A. Frances, Essentials of Psychiatric Diagnosis: Responding to the Challenge of DSM–5, p. 31 (rev. ed. 2013) ("The pattern of test scores is more important than the score on any given test"). When there are multiple scores, moreover, there is good reason to treat low scores differently from high scores: "Although one cannot do better on an IQ test than one is capable of doing, one can certainly do worse." Forensic Psychology 56. ("[A] sharp, unexplained

The Court's only attempt to address this is to say that "the analysis of multiple IQ scores jointly is a complicated endeavor," *ante*, at 11, but any evaluation of intellectual disability, whether based on objective tests or subjective observations, is "complicated." If conducting the proper analysis of multiple scores produces an IQ as reliable as the approach mandated by the Court, there is no basis for rejecting Florida's approach.[14]

\*    \*    \*

For these reasons, I would affirm the judgment of the Florida Supreme Court.

---

drop in IQ scores following incarceration can be strong evidence of malingering"); Frances, *supra,* at 31 ("[H]igher scores are likely to be the more indicative, since there are many reasons why a given score might underestimate a person's intelligence, but no reason why scores should overestimate it").

[14] The Court also states that because IQ testing itself may be flawed, "multiple examinations may result in repeated similar scores" that are "not conclusive evidence of intellectual functioning." *Ante*, at 12. That argument proves too much: If potential flaws in administering multiple tests are sufficient to render them inaccurate, the Court should conclude that even scores of 90 or 100 are not sufficient. The appropriate remedy for incorrectly administered tests is for a court to disregard those tests, not to ignore the well-established fact that multiple, properly administered tests yielding scores above 70 can give a high degree of confidence that an individual is not intellectually disabled.